## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

MALKA RAUL, Derivatively on Behalf of Nominal Defendant, PILGRIM'S PRIDE CORPORATION,

      Plaintiff,

v.

ANDRE NOGUEIRA DE SOUZA,
DENILSON MOLINA,
TAREK FARAHAT,
GILBERTO TOMAZONI,
WESLEY MENDONCA BATISTA,
JOESLEY MENDONCA BATISTA,
WILLIAM W. LOVETTE,
WALLIM CRUZ DE VASCONCELLOS JUNIOR,
DAVID E. BELL,
MICHAEL L. COOPER,
CHARLES MACALUSO,
FABIO SANDRI,
JBS S.A.,

      Defendants,

And

PILGRIM'S PRIDE CORPORATION,

      Nominal Defendant.

---

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

---

Plaintiff Malka Raul ("Plaintiff"), by and through her undersigned attorneys, brings this shareholder derivative action for the benefit of nominal defendant, Pilgrim's Pride Corporation ("Pilgrim's" or the "Company"), against certain current and former officers and members of the Company's board of directors (the "Board") seeking to remedy defendants' violations of §14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as defendant's breach of fiduciary duty, unjust enrichment, abuse of control, and gross mismanagement.  Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by Pilgrim's and other related parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the defendants (as defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on the Company's website concerning the Company's public statements; (d) review of the pleadings and other documents in the antitrust class action entitled *Maplevale Farms, Inc. v. Koch Foods, Inc. et al.*, 1:16-cv-08637 (N.D. Ill. Sept. 2, 2016) (the "*Maplevale* Action") (e) review of the pleadings and other documents in the securities class action lawsuits entitled *Patrick Hogan v. Pilgrim's Pride Corporation, et al.*, 1:16-cv-02611-RBJ (D. Colo.) (the "Securities Class Action"); and (f) review of other publicly available information concerning Pilgrim's and the defendants.

## **NATURE OF THE ACTION**

1.     This is a shareholder derivative action on behalf of nominal defendant Pilgrim's seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under § 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, as

well as defendant's breach of fiduciary duty, unjust enrichment, abuse of control, and gross mismanagement as a result of defendants causing the Company to issue materially misleading statements and/or omitting material information regarding the Company's financial results, business operations, competition with other poultry producers, as well as a price fixing scheme for broiler-chickens from February 21, 2014 until the present (the "Relevant Period").[1]

2.      Pilgrim's engages in the production, processing, marketing, and distribution of fresh, frozen, and value-added chicken products to retailers, distributors, and foodservice operators in the United States, Mexico, and Puerto Rico.

3.      Pilgrim's is a subsidiary of JBS S.A. ("JBS"), a Brazilian company which owns approximately 79% of the Company.  In turn, and as further detailed below, JBS is dominated by one family – the Batista family – and the Company admits as much in its proxies, stating, "***JBS is ultimately controlled by the Batista family***."  The Batista family exerts a high degree of control over Pilgrim's, as the Chief Executive Officer ("CEO") of the Company reports directly to the CEO of JBS USA Holdings, Inc. (a subsidiary of JBS), who in turn reports directly to the Batistas.[2]

4.      As detailed below, Wesley and Joesley Batista, who were CEO and Chairman of JBS, are currently in prison due to a decade's worth of crimes on behalf of JBS including bribing Brazilian officials, banks, and food safety inspectors (leading the United States to ban imports of Brazilian beef).  The Batistas operated JBS as a criminal enterprise, and utilized their control over Pilgrim's CEO Lovette with their trademark disregard for the law.

---

[1] The false and misleading statements were issued in the Company's public filings from approximately February 21, 2014 to October 27, 2016; however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient.

[2] https://www.sec.gov/Archives/edgar/data/802481/000080248110000052/ex99_1.htm.

5.     Throughout the Relevant Period, the Company systematically colluded with several of its industry peers to fix prices in the broiler-chicken market in violation of federal antitrust laws; resulting in legal actions against the company as detailed below.

6.     The truth concerning the price fixing scheme began to emerge on September 2, 2016, when food distributor Maplevale Farms, Inc. ("Maplevale") filed an antitrust class action complaint in the U.S. District Court for the Northern District of Illinois against Pilgrim's and several other poultry producers. The other poultry producers included in the *Maplevale* Action included Tyson Foods, Inc. ("Tyson"), and the *Maplevale* Action alleged that Pilgrim's and the other companies named in the *Maplevale* Action had conspired since 2008 to manipulate the prices of broiler chickens in violation of the Sherman Antitrust Act, 15 U.S.C. §§ 1-7 (the "Sherman Act").

7.     The complaint in the *Maplevale* Action alleged, in pertinent part:

> The principal (but not exclusive) method by which Defendants implemented and executed their conspiracy was by coordinating their output and limiting production with the intent and expected result of increasing prices of Broilers in the United States. In furtherance of their conspiracy, Defendants exchanged detailed, competitively sensitive, and closely-guarded non-public information about prices, capacity, sales volume, and demand . . . .

> Defendants continued to limit the United States Broiler supply . . . by destroying eggs, relying upon one another's production to meet customer needs, and exporting excess Broiler breeder flocks to Mexico, even when doing so was against their independent economic interest.

> The consequence of Defendants' cuts . . . have [sic] been a nearly 50% increase in Broiler wholesale prices since 2008, despite input costs (primarily corn and soybeans) falling roughly 20% to 23% over the same time period. The rise in Broiler prices relative to input costs has led to record profits for Defendants.

8.     Between September 7, 2016 and October 21, 2016, several similar class action complaints were filed against Pilgrim's and other poultry companies in the U.S. District Court for the Northern District of Illinois, on behalf of individual consumers and indirect purchasers of

broiler chickens, all alleging that Pilgrim's and its industry peers had engaged in the price-manipulation scheme described in complaint in the *Maplevale* Action.[3]

9.      On October 7, 2016, Pivotal Research Group ("Pivotal") downgraded Tyson from "Hold" to "Sell."   Explaining the downgrade, analyst Timothy Ramey directed investors' attention to the allegations of price manipulation by Pilgrim's, Tyson, and their industry peers and described the complaint in the *Maplevale* Action as "powerfully convincing."

10.      On news that Pivotal had downgraded Tyson on the strength of the price-manipulation allegations against Tyson, Pilgrim's, and the other poultry companies named in the complaint in the *Maplevale* Action, the Company's share price fell $0.95, or 4.5%, to close at $20.16 on October 7, 2016.

11.      On November 20, 2017, the *Maplevale* Action court denied the Company's motion to dismiss stating: "There is simply too much unusual market movement, unusual public statements, unusual information sharing through Agri Stats, and a coincidence of business strategies that make dismissal of Plaintiffs' claims at this point in the case inappropriate."

12.      As a result of defendants' wrongful acts and omissions, resulting in a precipitous decline in the market value of the Company's securities, the Company and its shareholders have suffered significant damages and losses.

## JURISDICTION AND VENUE

13.      This Court has jurisdiction over the claims asserted herein under 28 U.S.C. §1331

---

[3] *See John Gross and Company, Inc. v. Koch Food, Inc. et al.*, 1:16-cv-8737; *Fargo Stopping Center LLC v. Koch Foods, Inc. et al.*, 1:16-cv-8851; *Drucker et al. v. Koch Foods, Inc. et al.*, 1:16-cv-8874; *Percy et al. v. Koch Foods, Inc. et al.*, 1:16-cv-8931; *Don Chavas Mexican Restaurant, Inc. v. Koch Foods, Inc. et al.*, 1:16-cv-9421; *Monahan et al. v. Koch Foods, Inc. et al.*, 1:16-cv-9490; *Bodega Brew Pub, Inc. v. Koch Foods, Inc. et al.*, 1:16-cv-9589; *Ferraro Foods, Inc. et al. v. Koch Foods, Inc. et al.*, 1:16-cv-9684; *Glover et al. v. Koch Foods, Inc. et al.*, 1:16-cv-9912; *Joe Christiana Food Distributors, Inc. v. Koch Foods, Inc. et al.*, 1:16-cv-9900 (collectively, with the *Maplevale Action*, the "Antitrust Class Actions").

because the claims arise under and pursuant to §14(a) of the Exchange Act (15 U.S.C. §78n(a)) and Rule 14a-9 promulgated there under (17 C.F.R. §240.14a-9).

14.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a), as they relate to Plaintiff's claims under 15 U.S.C. §78n(a).

15.     Venue is proper in this Court because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and defendants have received substantial compensation within this District by doing business here and engaging in numerous activities that had an effect in this jurisdiction.  Also, the Company's principal executive offices are located at 1770 Promontory Circle, Greeley, Colorado 80634.

## THE PARTIES

16.     Plaintiff was a shareholder of the Company at the time of the wrongdoing complained of herein, has continuously held shares in the Company throughout the Relevant Period, and continues to hold shares of Pilgrim's currently.

17.     Nominal defendant Pilgrim's is a Delaware corporation with its principal executive offices located at 1770 Promontory Circle, Greeley, Colorado 80634.  Pilgrim's trades its stock on the NASDAQ under the ticker ("PPC").

18.     Defendant JBS, the Brazilian based largest meat producing company in the world, was founded by Jose Batista Sobrinho in 1953 (from whose initials JBS draws its name).

19.     The Batista family has been in control of JBS since its founding 65 years ago, and was, during the events herein described, led by Jose Batista Sobrinho's sons, JBS CEO Wesley Batista (since January 2011) and JBS Chairman of the Board of Directors Joesley Batista (CEO from March 2006 until January 2011), becoming the world's second largest food company according to Bloomberg.  The Batista family, primarily through their investment vehicle J&F

Investimentos S.A., own approximately 44% of JBS.

20.     JBS, through its subsidiary JBS USA Holdings, Inc. ("JBS USA"), holds a 78.5% controlling interest in Pilgrim's, acquired during the Company's Chapter 11 bankruptcy in 2009.

21.     Pursuant to the Company's Amended and Restated Certificate of Incorporation, JBS USA appoints six of nine of the Pilgrim's Board of Directors.[4]

22.     Defendant Andre Nogueira de Souza ("Souza") has been a director of the Company since October 2014, when he was appointed to that position by the JBS Nominating Committee.

23.     Defendant Souza is CEO and President of JBS USA (since January 1, 2013), was Chief Financial Officer ("CFO") of JBS USA from 2007 through 2011, and was CEO of JBS Australia until his 2013 appointment as CEO of JBS USA. On its website, JBS lists defendant Souza as one of "Our Leaders."[5]   Defendant Souza is a member of the JBS Nominating Committee.

24.     Defendant Denilson Molina ("Molina") was appointed as a director of the Company by the JBS Nominating Committee in June 2017, at which time the JBS Nominating Committee reported to shareholders that defendant Wesley Batista had, "resigned as a director effective immediately," and that the JBS Nominating Committee appointed defendant Molina to replace defendant Wesley Batista.  On its website, JBS lists defendant Molina as one of "Our Leaders."[6] Defendant Molina is a member of the JBS Nominating Committee.

---

[4] *Available at* https://www.sec.gov/Archives/edgar/data/802481/000120677412004988/exhibit3-1.htm.

[5] *Available at* https://jbssa.com/about/leadership/.

[6] *Id.*

25.     Defendant Molina has been the CFO of JBS USA since 2012.

26.     Defendant Tarek Farahat ("Farahat") has been a director of the Company since May 2017, at which time the JBS Nominating Committee reported to shareholders that Joesley Batista had, "resigned as a director effective immediately," and that the JBS Nominating Committee appointed defendant Farahat to replace defendant Joesley Batista.

27.     Defendant Farahat was the chairman of the board of JBS from 2013 until October 2017 and Global President of Marketing and Innovation of JBS from 2015 until October 2017.[7]

28.     Defendant Gilberto Tomazoni ("Tomazoni") has been the Chairman of the Board since July 2013 and is a member of the JBS Nominating Committee.

29.     Defendant Tomazoni is President of the Global Poultry Division of JBS since 2013.

30.     Defendant Wesley Mendonça Batista ("W. Batista" or "Wesley Batista") was a director of the Company from December 2009 until June 2017, at which time he resigned from the Board for reasons which defendants did not disclose to Company shareholders.  The reason for W. Batista's resignation was his indictment and imprisonment on multiple criminal counts in connection with JBS as described more fully below.  W. Batista was the Company's Chairman of the Board from December 2009 until July 2013, and was the Chairman of the Compensation Committee and Chairman of the JBS Nominating Committee until his resignation.

31.     Defendant W. Batista was CEO and President of JBS from February 2011 until September 2017, at which time he had been imprisoned, and the Brazilian government forcibly removed him from the positions of CEO and President of JBS; W. Batista had been an executive officer of JBS since 1987.

---

[7] *Available at* http://ir.Pilgrims.com/directors.cfm.

32.     Defendant Joesley Mendonça Batista ("J. Batista" or "Joesley Batista") was a director of the Company from December 2009 until May 2017 (and a member of the JBS Nominating Committee), at which time he resigned from the Board for reasons which defendants did not disclose to Company shareholders.   The reason for J. Batista's resignation was his indictment on multiple criminal counts in connection with JBS as described more fully below.

33.     J. Batista was the CEO and President of the Board of Directors of JBS until his May 2017 arrest and imprisonment and forcible removal from those positions by the Brazilian government, and was the Chief Executive Officer ("CEO") of JBS from March 2006 until January 2011 and had been an executive officer of JBS since 1988.

34.     Defendant William W. Lovette ("Lovette") has been a director of the Company since February 21, 2011 and has been the CEO and President of Pilgrim's since January 3, 2011. For the fiscal years ended 2016, 2015 and 2014, defendant Lovette received $2,975,725 $6,553,337, and $9,286,078 in total compensation,[8] respectively.   On its website, JBS lists defendant Lovette as one of "Our Leaders,"[9] and the Company describes defendant Lovette's relation to JBS as follows:

> "Mr. Lovette will report directly to [prior Pilgrim's CEO] Mr. Jackson, who will continue to serve on Pilgrim's board of directors.  In his new role, Mr. Jackson will continue reporting to Wesley M. Batista, who will remain as chairman of Pilgrim's and JBS USA Holdings, Inc.".[10]

---

[8] Includes salary, bonus, stock awards, non-equity incentive plan compensation and all other compensation.

[9] *Available at* https://jbssa.com/about/leadership/.

[10] *Available at* https://www.sec.gov/Archives/edgar/data/802481/000080248110000052/ ex99_1.htm.

Defendant Lovette is a member of the JBS Nominating Committee.[11]

35.    Defendant Wallim Cruz De Vasconcellos Junior ("Vasconcellos") has been a director of the Company since December 2009 and is a member of the Audit and Compensation Committees.  Defendant Vasconcellos is a member of the JBS Nominating Committee.

36.    Defendant David E. Bell ("Bell") has been a director of the Company since July 2012.

37.    Defendant Michael L. Cooper ("Cooper") has been a director of the Company since December 2009.

38.    Defendant Charles Macaluso ("Macaluso") has been a director of the Company since December 2009.

39.    Defendants Souza, Molina, Farahat, Tomazoni, Lovette, Vasconcellos, Bell, Cooper, and Macaluso are collectively referred to herein as the "director defendants."

40.    Defendant Fabio Sandri ("Sandri") has been the Company's CFO since June 6, 2011.  For the fiscal years 2016, 2015 and 2014, defendant Sandri received $1,183,728, $2,012,545, and $2,433,982 in total compensation, respectively.

41.    The director defendants, along with defendants W. Batista, J. Batista, and Sandri are collectively referred to herein as the "individual defendants."

42.    The individual defendants, along with JBS, are collectively referred to herein as the "defendants."

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

43.    Pilgrim's was incorporated in 1986 and is headquartered in Greeley, Colorado.  As

---

[11] Form DEF 14A, at 2, filed with the SEC on March 25, 2011.

of December 28, 2014, Pilgrim's operates as a subsidiary of JBS USA.  Pilgrim's engages in the production, processing, marketing, and distribution of fresh, frozen, and value-added chicken products to retailers, distributors, and foodservice operators in the United States, Mexico, and Puerto Rico.

44.     The Company offers fresh chicken products comprising pre-marinated or non-marinated refrigerated (non-frozen) whole chickens, whole cut-up chickens, and selected chicken parts and also provides prepared chicken products, including portion-controlled breast fillets, tenderloins and strips, delicatessen products, salads, formed nuggets and patties, and bone-in chicken parts.  Pilgrim's sells its products to foodservice market, including chain restaurants, food processors, broad-line distributors, and other institutions; and retail market customers comprising grocery store chains, wholesale clubs, and other retail distributors.  The Company exports chicken products to the Middle East, Asia, the Commonwealth of Independent States, and other countries.

45.     The Company currently accounts for approximately 16.6% of the domestic market for chicken products, behind only Tyson, which accounts for 21%.  In fiscal year 2016, chicken sales accounted for nearly $7.5 billion of the Company's $7.9 billion in net sales.

## The JBS Acquisition

46.     In 2007 and into early 2008, Pilgrim's, which had then recently acquired a company called Gold Kist for $1.3 billion, was particularly vulnerable financially given their debt level, even though they were the second largest chicken company in the country at the time.

47.     On a January 29, 2008 earnings call, Pilgrim's then-CFO Rick Cogdill explained that the industry was oversupplying Broilers, which was driving down chicken prices. Cogdill acknowledged that Pilgrim's was doing its part to cut production, but called other industry

leaders to do their part or prices would remain depressed:

> "[A]ctions are going to have to be taken one way or the other through the industry to pass along these costs. We were the leader in cutting production last year to help drive that. . . . [W]e've got to make sure that we get the supply in line with demand at an acceptable price, not just in line with what the customer wants to buy at a cheap price."

48.     Over the next several months, Pilgrim's continued to cut its production, closing processing plants, and implored others to do the same.  On March 12, 2008, Pilgrim's then-CEO Clint Rivers publicly announced massive closures at its processing plants, stating: "we believe [these] actions . . . are absolutely necessary to help bring supply and demand into better balance."

49.     In December 2008, Pilgrim's filed for bankruptcy.  Under a year later in 2009, JBS purchased a 78.57% majority stake in the Company for $800 million.

50.     As part of the purchase agreement, JBS obtained control of Pilgrim's through a provision providing that six members of the reorganized Company's Board of Directors would be assigned by JBS.

## JBS is Exposed as a Massive Criminal Enterprise

51.     JBS was founded by José Batista Sobrinho in 1953.  By approximately 2000, founder Jose Batista's two sons, Wesley and Joesley Batista, had taken over the primary positions of control of JBS.  According to the Company's proxies, "***JBS is ultimately controlled by the Batista family***."[12]

52.     Defendant J. Batista was, during the time of the events described herein, the Chief Executive Officer (from March 2006 until January 2011) and Chairman of the Board of Directors of JBS until May 2017 (and a director of the Company since 2009).

53.     Defendant W. Batista was, at the time of the events described herein, Chief

---

[12] Form DEF 14A, at 42, filed with the SEC on March 31, 2017.

Executive Officer and President of the Board of Directors of JBS since 2011.  W. Batista was
Chief Executive Officer and President and Chairman of the Board of Directors of JBS USA Food
Company Holdings from 2007-2011 (and a director and Chairman of the Board of the Company
from 2009 through 2013).

54.     The Batista brothers, through a series of acquisitions (funded by billions in
financing at favorable interest rates from Brazil's Development Bank, BNDES), expanded JBS
aggressively, purchasing Swift & Co. in 2007, the Smithfield Beef Group and Five Rivers Cattle
Feeding in 2008, and Pilgrim's Pride in 2009, along with many other companies.  By 2016, JBS
was the world's largest fresh beef and pork processor with sales of $52.3 billion in 2016.

55.     As detailed below, JBS is at its core a criminal enterprise, and its rapid expansion
was one of the fruits of its criminal conduct.  The major Brazilian newspaper *O Globo* reported
on May 17, 2017, that defendant JBS CEO Wesley Batista and defendant JBS Chairman of the
Board Joesley Batista and five other JBS's executives and J&F Investimentos, had signed a plea
bargain with the Brazil Federal Public Prosecutor's Office, which was ratified by the Brazilian
Supreme Court, in which they admitted to a massive bribery conspiracy in which JBS, the
Batista brothers, and five other JBS executives had paid approximately $200 million in bribes to
over 1,800 politicians and government employees, including food safety inspectors, over the
course of a decade.

56.     The plea bargain included a fine totaling 225 million reais ($75 million) imposed
upon JBS and the JBS executives, as well as their cooperation with the Public Prosecutor's
Office regarding all matters disclosed to the authorities, among other obligations.  In a securities
filing, JBS said the fines settle charges of two corruption probes involving the company.

57.     J&F Investimentos, the Batista family's investment vehicle and the controlling

shareholder of JBS, agreed to pay a record-setting 10.3 billion real ($3.2 billion) fine for its role in the ongoing criminal enterprise.

58.     Most of the fine will be paid back to the Brazil Development Bank (BNDES) and lender Caixa Econômica Federal in connection with a decade's worth of sweat-heart loans extended to J&F companies in return for bribes paid by the Batista brothers, according to plea-deal testimony.[13]

59.     *O Globo* reported that the Batista brothers had been cooperating with the prosecutors since at least March, 2017, after JBS was accused of systemically paying off meat safety officials to approve rotten and contaminated meat for export (causing several countries to temporarily halt imports of Brazilian meat, the country's third-biggest export industry).[14]   The Batista brothers cooperated with the police by using hidden cameras and tracking chips in bags of cash to record a series of bribes to politicians, according to *O Globo*.[15]   Defendants Wesley and Joesley Batista and other JBS executives admitted to paying millions of dollars in bribes on

---

[13] The plea deal has now been revoked as a result of the indictment and indictment and arrest of the Batista brothers, on approximately September 12, 2017, by Brazil's federal police on charges of insider trading ahead of the public announcement of the May 2017 they signed in May 2017, whose disclosure predictably pummeled the company's stock.  The Batista insider trades of JBS stock took place after they entered into the plea deal to cooperate with the authorities in March 2017, and before the plea deal was leaked to the press on May 17, 2017.  Because of the massive scope of the Batista's briberies, including senior politicians up to and including three Brazilian presidents, the disclosure of the plea deal and accompanying Batista admissions, led to Brazil's worst financial market selloff in over a decade.  Additionally, in anticipation of the huge negative impact of the anticipated leak, the Batistas created a strategy to protect their JBS holding and help the company amass large foreign-currency positions ahead of the leak.  On May 18, after the public disclosure of the plea deal, the Brazilian stock market shed 9.7%, while the Brazilian reais tumbled 8.2%.

[14] https://www.reuters.com/article/us-brazil-corruption-jbs/brazils-jf-agrees-to-pay-record-3-2-billion-fine-in-leniency-deal-idUSKBN18R1HE.

[15] https://www.ft.com/content/ce6e7f2b-2c8c-36e8-821a-865bc3db6641.

behalf of JBS Brazilian President Michel Temer, and that JBS had paid former presidents Luiz Inacio Lula da Silva and Dilma Rousseff $80 million in bribes in offshore accounts.

60.     J. Batista, cooperating with the authorities, tape recorded President Temer suggesting to J. Batista that Congressman Rodrigo Rocha Loures could resolve an unspecified issue for J&F Investimentos, and Loures was then filmed receiving 500,000 reais ($160,000) sent by J. Batista.[16]

61.     The criminal enterprise conducted for well over a decade by the Batistas through JBS began to unravel long before the Batistas negotiated a plea deal with the Brazilian federal prosecutors in March 2017 (a process referred to as "leniency" under Brazilian law) relating to the above crimes involving JBS (the investigation and prosecution of which were dubbed "Operation Carwash" in Brazil).

62.     In January 2016, JBS Chairman J. Batista was charged by Brazilian federal prosecutors with criminal manipulation of loans from state controlled banks to JBS (the investigation and prosecution of which were dubbed "Operation Greenfield" in Brazil), as reported by *Reuters* on January 26, 2016.[17]

63.     By September 2016, Operation Greenfield was widely reported in the international press.  In September 2016, a Brazilian federal judge barred Wesley and Joesley Batista from serving as executive officers and chairman of JBS, and implicated the chief executive of wood pulp maker Eldorado Brasil Celulose SA, also controlled by the Batista family, Jose Carlos Grubisich, in the crimes.  At the time, "Press representatives for J&F and

---

[16] http://www.reuters.com/article/us-brazil-corruption-idUSKCN18D2XY.

[17] https://www.reuters.com/article/jbs-brazil/update-2-brazil-prosecutors-charge-jbs-board-chairman-shares-fall-idUSL2N15A1YU.

Eldorado said their executives were collaborating with the investigation. JBS referred comment to J&F."[18]

64.     In early 2017 the Batista brothers negotiated a plea bargain with the Brazilian federal prosecutors relating to the "Operation Greenfield" charges, under which the Joesley Batista agreed to the government freezing assets worth as much as 3.8 billion reais ($1.22 billion) belonging to Batista and his co-conspirator, as reported by Reuters on February 6, 2017:

FEBRUARY 6, 2017 / 6:57 PM
**Brazil prosecutors claim JBS's Batista, Eldorado's CEO broke agreement**
Reuters Staff

SAO PAULO, Feb 6 (Reuters) - Federal prosecutors asked a court on Monday to re-impose preventive measures against two key suspects in a corruption probe dubbed Operation Greenfield, which is investigating fraud at state-run companies' pension funds.

According to the prosecutors' statement, defendants Joesley Batista, from the family that controls meatpacker JBS S.A., and José Carlos Grubisich Filho, chief executive of pulp producer Eldorado Brasil Celulose SA, breached an agreement that had been signed with the prosecutors related the investigation.

Asking the court to recognize that the defendants "violated principles of good faith" contained in the agreement, the prosecutors petitioned a judge to block assets worth as much as 3.8 billion reais ($1.22 billion) belonging to the investigated parties.
The sum, said the prosecutors, would serve as "a guarantee" to compensate losses allegedly caused by the defendants in their business dealings with state-run companies' pension funds, as well as state-bank Caixa Econômica Federal and the FGTS workers' severance fund.

The probe of the pension funds is one in a string of corruption investigations into the vast overlap of Brazilian business and politics.

J&F, the Batista family holding company that controls both JBS and Eldorado, did not have an immediate comment. ($1 = 3.1150 reais).

65.     By the time the director defendants issued Pilgrim's Pride's 2017 Proxy,

---

[18] https://www.reuters.com/article/us-brazil-corruption-pensions/jbs-ceo-ordered-to-step-aside-in-brazil-pension-fund-probe-idUSKCN11B14G.

defendants were well aware of the above and knew that the Batistas and JBS were facing multiple criminal charges and had negotiated plea bargains admitting the crimes, and were under investigation for a massive over decade long pattern of criminal conduct at the heart of JBS operations.

66.    As more fully detailed below, rather than serve the interests of the Company and take steps to remove (or limit) the Batistas and JBS' control of Pilgrim's Pride, defendants faithfully served the interests of the Batistas and JBS by appointing the Batista brothers to the position of Company directors, without mentioning in the 2017 Company Proxy that the Batistas and JBS were under indictment, and had negotiated plea bargains admitting the crimes, in which they admitted to operating a vast criminal enterprise through JBS.

## Overview of The Broiler Industry

67.    In particular, Pilgrim's focuses its business on the production and sale of Broiler chickens ("Broilers"), which are standard, non-organic, non-kosher chickens under 13 weeks of age.  Broilers make up nearly 98% or more of the chicken sold in the United States.  As there is very little to distinguish a Broiler sold by the Company from one by a competitor, Broilers are considered to be a commodity, with defendant Lovette himself admitting as such, stating, "our business…the [Broiler] chicken business *per se* is a commodity business."  The USDA treats Broilers in the same manner.

68.    Due to the fact that Broilers are a commodity for which demand has generally grown slowly but steadily since the 1950's, the market for Broilers is characterized by interesting demand – the demand for Broilers does *not* meaningfully increase or decrease with changes in its price; however, a decrease in supply will increase prices.  Accordingly, the correlation between supply and price is both predictable and calculable.  A 2008 study conducted by The Hudson

River Group, a consultant for the Company, found that a one percent decrease in the supply of Broilers leads to a 0.8% increase in the price of Broilers.  From the Company's and other chicken producers' standpoint, keeping a low supply of Broilers keeps prices high, and works to the benefit of all involved.

69.     Prior to 2008, when Pilgrim's and other Broiler companies first began coordinating their output and limiting production, the price and supply for Broilers would follow a pattern akin to a "boom and bust" cycle.  When prices for Broiler chickens would rise, the chicken producers would increase their production to gain more revenue, resulting in oversaturation and falling prices.  This, in turn, would cause production to decline as it became less profitable to produce more chicken, and the cycle would begin again.

70.     As a result of this continuous cycle, the financial health of industry players, therefore, followed a volatile pattern.  For instance, between 2000 and 2008, the Company's profit margins swung from as low as -5.3% to as high as 13.8%, averaging about 6.1% each year. Other companies performed similarly.  Tyson's margins varied between 1.2% and 7% in the decade prior to 2008 and could not sustain a margin increase for more than two years during that time.

71.     This pattern was the product of an economic landscape filled with competition. Even though those in the industry were aware that lower supply would cause higher prices, chicken producers could not lower supply themselves by cutting their own production, because if they did, they would lose out on the revenues from the high Broiler prices while other producers would pick up the slack and gain market share.

72.     A number of different traits of the Broiler industry and conditions leading up to 2008 provided Pilgrim's and other companies with the opportunity and means to engaged in a

collusive scheme to fix the price of Broilers in the United States for their own benefit.

73.     In order to understand how these companies could cut or ramp up production, it is important (and necessary) to understand the production cycle of Broilers, as well as how companies are built to maximize profit in the production cycle.

74.     The Broiler industry is almost entirely vertically integrated, meaning that the Companies that produce and process Broilers (such as Pilgrim's and Tyson) own or tightly control almost all aspects of Broiler production, including breeding, hatching, rearing, feeding, processing, and, ultimately, selling.

75.     At the very top of the production cycle, most Broiler producers rely on only a handful of unique Broiler breed lines to mass produce nearly identical chickens with desirable genetic traits for yielding meat.  The genetics companies—also known as primary breeders— develop the strains for grandparent and great-grandparent breeding stock, and then sell the young breeder hens ("breeder pullets") with these ideal characteristics to integrated Broiler producers, who then raise the pullets to lay eggs to be taken to producer-owned hatcheries. There are only three global genetics conglomerates that produce these grandparent and great-grandparent strains, the largest of which, Cobb-Vantress, is owned by Broiler producer Tyson.

76.     There is one stage in this production cycle not performed by the Broiler producers – growing chickens.  Over time, Broiler producers realized that using contractors to grow full-size Broilers was more economically favorable than performing the task on their own, so a system was developed allowing them to maintain ownership of the chickens and periodically monitor them, while a contract farmer actually grows them for a period of 6-7 weeks.  Once fully grown, the Broilers are picked up by the producer, and brought to a producer-owned processing plant.  From there, some Broilers are sold without further processing (whole chicken or parts),

and some are taken for further processing into "value-added" products, such as chicken nuggets.

77.   The chart below, created by the National Chicken Counsel, is illustrative:



78.   By having control over nearly all the stages of production, a vertically integrated company can control costs, quality and uniformity, and gives it complete control over the supply. According to Michael R. Dicks, a professor of agricultural economics at Oklahoma State University and former expert witness for Tyson for testimony before Congress on May 21, 2010, entitled "Concentration and Competition in the Poultry Industry," Professor Dicks stated: "[i]n the poultry industry vertical coordination allows integrators to manage excess capacity to manage price. Integrators can minimize the effect on producers by increasing the time between collection and delivery of birds or reducing the number of flocks per year rather than terminating

grower contracts in much the same way the USDA requires all commodity program recipients to adhere to acreage reduction program guidelines and grower associations require members to cut back marketable output."   Accordingly, in a vertically integrated production system, Broiler producers have a number of options available to decrease their own production.

79.     Due to the vertically integrated nature of Broiler producers, only a small number of poultry companies exist today.  A USDA report from November 2013 stated, "[d]uring the past 16 years, firms in the Broiler industry continued to decrease in number and grow in size, thereby gaining further economies of scale and scope in processing and marketing. According to the NCC, 55 federally inspected Broiler companies operated in 1995, compared with 41 companies in 2010." By 2014, that number had decreased to just 35; of those companies, three – Tyson, Pilgrim's, and Sanderson – hold nearly 46% of the total market share, and the top five companies dominate over 65% of the market.

80.     Given that the Boiler industry is dominated by few companies, employees—including executives—will often leave one company to go work for a competitor.  For instance, and perhaps most notably, defendant Lovette worked at Tyson, the Company's primary competitor, for 25 years before becoming the President and Chief Operating Officer ("COO") of Case Foods, another vertically integrated poultry farming company, which would ultimately lead him to the CEO position at the Company. Based upon information from a confidential witness (Pilgrim's Executive Vice President of National Accounts from July 2010 to July 2013 and who had also worked for Tyson between 1989 and 2005) in the Securities Class Action, one of defendant Lovette's best friends is Devin Cole, who was the Chief Commercial Officer of Tyson until December 2014. The Securities Class Action alleges that "Lovette and Cole both live in Colorado, golf and ski together, and attributed their strong relationship to the similarity in

business models between Pilgrim's and Tyson."

81.    The Securities Class Action further alleges that these relationships between industry employees and executives were not limited to the golf course and ski slopes. According to confidential witnesses in the Securities Class Action, people would regularly call old colleagues regarding business. In one instance, the confidential witness recalled being in a meeting when a high-ranking executive of Pilgrim's called the CEO of another company, at which point the confidential witness stated that he/she would not be a part of such unethically collusive conduct and walked out of the room.

82.    The close nature of the Broiler business is even more evident in the various industry associations and committees in which the Broiler executives participate.  The various meetings and retreats of these organizations provide them with opportunities for personal interaction in order to build relationships and discuss matters pertinent to business.  For example, the main industry lobby is the National Chicken Council, which represents approximately 40 member companies that, according to the National Chicken Council's website, "account for approximately 95% of the chicken sold in the United States."  There are around ten meetings a year, as well as three board meetings which take place in resorts across the country.  A significant amount of time at these meetings are devoted to personal interaction between the attendees.  For instance, the 2017 summer board meeting held in Sea Island, Georgia, included numerous cocktail receptions, group meals, a golf tournament, clay target shooting, and a yacht cruise.

83.    Defendant Lovette served as Secretary Treasurer, Vice Chairman and then Chairman of the National Chicken Council, along with various other executive officers in the Poultry industry between 2010-13, which was a critical time period where the Broiler industry

was coordinating supply cuts, as set forth below.  Further, having worked as an executive officer of Tyson for 25 years, defendant Lovette had deep contacts within the highest executive levels of leadership at Tyson.

84.     The Company and other Broiler producers including Tyson, Sanderson, and Purdue also have memberships with other various state and regional poultry organizations, such as the Poultry Federation (representing poultry and egg industries in Arkansas, Missouri and Oklahoma), the Georgia Poultry Federation, and the North Carolina Poultry Federation. Similar to the National Chicken Council, each of these organizations holds regular meetings, which high-ranking executives of the above-named companies attend.  Another such organization, the Georgia Dock Advisory Committee, discussed further below, includes as one of its committee members Jayson Penn, Pilgrim's Executive Vice President of Sales & Operations, as well as other high ranking executive officers from the various major poultry producers in Georgia.

85.     As detailed below, the coordinated production cuts initiated by the Company and its competitors between 2008 and 2016 occurred right after these types of important industry meetings, where senior executives of the Company and other Broiler companies had ample opportunity to interact, providing a strong inference of collusion and communication between the companies.

**Industry Collaboration**

86.     Industry players have a long history of trying to stabilize the Broiler industry with cooperative behavior, which has resulted in the United States Department of Justice ("DOJ") prosecuting the poultry industry under federal antitrust laws.  In April 1973, the DOJ filed an antitrust action against the National Broiler Marketing Association ("NBMA") alleging the NBMA and its members – also vertically integrated Broiler producers – conspired to fix the

prices of Broiler chickens and restrict Broiler chicken production in violation of Section 1 of the Sherman Act. The DOJ specifically had issue with a program by NBMA members in which they would hold conference calls in order to coordinate the pricing and supply of Broiler chickens. In addition to the DOJ action, Numerous private civil antitrust actions were filed in the *In re Chicken Antitrust Litigation*, which settled in 1977 for approximately $30 million. The members of NBMA also agreed to cease and desist their practices that facilitated collusion, including the above referenced conference call program.

87.    Since the settlement, however, Pilgrim's and other Broiler producers have had ample opportunity (due to a lack of government antitrust enforcement against the Broiler industry) to engage in similar illicit behavior. According to author Christopher Leonard, the Grain Inspection, Packers and Stockyards Administration ("GIPSA"), the agency in charge of regulation of the meat (including poultry) industry, had become so "weak and incompetent," that by 2008, its "guiding doctrine . . . seemed to be to sit on the sidelines and do nothing." Mr. Leonard also stated that within GIPSA, "there was…no internal system to track investigations, a problem that had been identified years before," and "staff members…seemed to have the mentality that it was best not to make waves and best not to antagonize the meat companies."

88.    The inaction of GIPSA provided a perfect opportunity for companies in the poultry industry to engage in anticompetitive behavior at will. As a result, the Obama Administration pressed the USDA and GIPSA in early 2009 to increase their regulatory activities. Soon after, GIPSA planned to implement rules to make it easier for contract growers to sue Broiler producers for antitrust violations. GIPSA, along with the USDA, also held workshops in 2010, in which they listened to the publics input on the suggested rules.

89.    The Broiler industry greatly objected to these efforts, and together with industry

lobbyists, worked to oppose GIPSA regulatory expansion throughout 2010, successfully thwarting the efforts to expand GIPSA's antitrust enforcement. In November 2011, Congress passed a spending bill preventing GIPSA from using any money to finalize its new antitrust regulations, resulting in GIPSA not taking a single antitrust enforcement action against any company in the Broiler industry.

90.     In place of federal enforcement, a number of private lawsuits filed in the last ten years have taken up the task of attempting to hold the industry accountable, documenting the lack of competition in the contract-farmer Broiler market. For example, in *Adams v. Pilgrim's Pride*, 09-cv-397 (E.D. Tex.), *Been v. O.K. Industries*, No. 08-7078 (E.D. Okla.), and *Wheeler v. Pilgrim's Pride Corp.*, 06-cv-4 (E.D. Tex.), contract-farmers alleged violations of the Packers and Stockyards Act ("PSA"), 7 U.S.C. § 193(a), § 209.3. In September 2011, after a one-month bench trial in *Adams*, U.S. Magistrate Judge Charles Everingham IV found that Pilgrim's had in fact violated federal antitrust law when it suspended operations at the Company's El Dorado plant in an effort to raise Broiler prices. Judge Everingham IV ordered over $25.8 million in damages to more than 90 former poultry contract growers for the company. However, in August 2013, the Fifth Circuit vacated the penalty, explaining that the PSA, as an antitrust statute, is intended to ensure market competition, not to necessarily just protect low prices. In other words, the Fifth Circuit determined that the plaintiffs' evidence that Pilgrim's attempted to raise Broiler prices by cutting its own production, by itself was not an antitrust violation.

91.     The complaint filed in the *Maplevale* action in September 2016 (and subsequently amended in November 2016), however, does contain such evidence of collusion. The *Maplevale* complaint brings to light the manner in which the poultry industry colluded and conspired to fix chicken prices during a period between 2008 and 2016, alleging that the 27 defendants, including

Pilgrim's, Tyson, Sanderson Farms, and others, manipulated the price of Broilers by limiting production and exchanging detailed information about prices, capacity, and sales through Agri Stats, through interaction in industry associations (such as those mentioned above), and by manipulating the Georgia Dock pricing index published by the Georgia Department of Agriculture. The allegations in the *Maplevale* complaint, combined with subsequent news and analyst reports further expanding on those allegations, provide strong support for the falsity and misleading nature of statements made by Pilgrim's during the Relevant Period regarding its financial results, business operations, competition with other poultry companies, and its successful efforts to transform the Company since its bankruptcy.

### Pilgrim's, in Financial Distress, Colludes with Its Competitors to Reduce Broiler Production and Manipulate Broiler Prices

92.     In an article published in *Bloomberg* written about the poultry industry's supply and price-fixing scheme, Peter Carstensen, a former antitrust lawyer for the Department of Justice and law professor at the University of Wisconsin, explained, "[i]t only makes sense to cut production if, and only if, your competitors cut back, too."

93.     Until 2008, if one poultry company lowered its production of Broiler chickens, another would take its place and fill the gap to the lowering company's detriment.  While previous attempts to engage in discussion between poultry companies to discuss production and pricing plans and to ensure that others committed to the same practices drew scrutiny from the DOJ and other federal regulators as improperly collusive and anticompetitive, Pilgrim's and other poultry producers discovered an alternative method to communicate their operations and supply-reducing commitments with one another: Agri Stats.

94.     Agri Stats provides a private service, gathering data from various poultry processors, and then produces confidential weekly and monthly reports which is disseminated

back to companies that pay for subscriptions to this information (including Pilgrim's). Companies with a subscription pay hundreds of thousands of dollars a year for access to the service, which provides subscribers with near-instant and exceptionally transparent visibility into highly proprietary production metrics of nearly 95% of poultry processors in the United States.

95.    Agri Stats reports are not available to the public and the cost of subscription, along with confidentiality and non-disclosure agreements, ensure that only Agri Stats and the Broiler producers have access to the data provided by the reports.   The allegations in the Securities Class Action, in which former employees of Pilgrim's and Agri Stats with firsthand knowledge of the reports, public reports, filings and investigations, paint a detailed picture of the extensive data both provided to and disclosed by Agri Stats.

96.    For instance, the Securities Class Action alleges that a former Agri Stats Accounting and Statistical Analyst from 2008 to 2012 confirmed the following categories of information contained within Agri Stats reports, for both the industry as a whole as well as for individual producers:

- Inventory levels of Broilers.

- Detailed production statistics by participating company, including the number of Broilers placed with grower farms, mortality, days between flock deliveries, fee-to-meat conversion rate by pounds of feed per pound of Broiler, average Broiler daily weight gain, live pounds of feed per pound of Broiler, average Broiler daily weight gain, live pounds produced per square foot of grower house, breed composition, etc.

- Sales organized by Broiler production complex and type of product produced at the complex, including types of cut produced, packaging, and channel segmentation (i.e., retail vs. export).

- Hatchery statistics, including population and age of Broiler breeder flocks (the egg laying parent flocks of Broilers grown for consumption), which allows recipients to determine the maximum number of Broilers each producer can deliver to growing operations in the coming months.

- Financial information, such as monthly operating profit, sales, and costs.

- Feed data, including manufacturing cost and source material costs.

- Processing information, including total volume from processing plants, age and weight of processed Boilers and processing speed.

97.    The Securities Class Action also alleges that additional confidential witnesses with knowledge all confirm that Pilgrim's exchanged extensive information with Agri Stats. According to a former Director of Project Management and Retail Marketing at Pilgrim's from October 2012 to December 2015, the Company would receive huge books from Agri Stats each month with the data.  Yet another confidential witness stated that marketing had to make sure that Agri Stats analysts had all the SKUs (stock keeping units – unique identifiers for products that help keep track of inventory) that Pilgrim's produced, which were both generic and customer specific.

98.    A May 19, 2010 report by industry consulting firm FarmEcon LLC, entitled "Competition in the U.S. Chicken Sector" described Agri Stats' pricing data as "considerably more detailed than the USDA reports," such that Agri Stats:

> [C]ollects their data from actual sales of chicken companies that represent the vast majority (about 95%) of sales. Their daily report currently includes more than 75 items at the wholesale level. Reported data include weighted average price, top third average, bottom third average and volume traded. Reports are available on a daily, weekly and monthly basis. Prices reported include both spot market and contract sales, and reflect actual transaction pricing and volume.

99.    Despite the efforts to maintain the confidentiality and inaccessibility of the Agri Stats reports, *Bloomberg Businessweek* obtained a Report from 2014, which is described in Christopher Leonard's February 15, 2017 article, "Is the Chicken Industry Rigged? Inside Agri Stats, the Poultry Business's Secretive Info-Sharing Service," as 500 pages or more and including "an extensive breakdown for 33 poultry plants, covering granular data in a number of

areas, including product mixes—something most companies would characterize as proprietary."

100.    The staggering amount of information and extreme level of detail contained in these reports illustrates Broiler producers' collusion and anticompetitive behavior. This operational information is highly confidential and proprietary, and under any other circumstances—but-for the purpose of collusion and cooperation—would be a closely-guarded secret by the companies involved.  While Agri Stats and the poultry industry maintain that the information conveyed in the reports does not run afoul of antitrust laws because no company names are used, former Pilgrim's, Tyson, and Agri Stats employees explain that such anonymity is a fiction, because industry insiders can easily ascertain the identities of the companies based on the information provided.

101.    The Securities Class Action complaint contains allegations based off information from a confidential witness (a former Agri Stats employee who served as Office Manager at the company's headquarters from July 1996 to July 2013) that Broiler producers could easily identify the different companies and production plants listed in Agri Stats' reports. According to this confidential witness, the reports ranked each producer by various metrics, and producers could identify one another by production size alone. The regional reports were exceptionally detailed and voluminous, as they contained granular data for nearly every one of the major production complexes in the industry, including production levels, breed, bird size, type, etc. Participating producers would receive a number of different books from Agri Stats (red for sales, tan for profit, ivory for bottom line, light blue for processing, light green for live, golden rod for rendering), and in the front of each book would list all competitors who were in the book by location (around 70 locations). The confidential witness explained that Agri Stats reports listed industry Broiler complexes by numbers that never changed from report to report, meaning that a

participant would only need to identify the complex once to understand its number designation for the future.

102.     The confidential witness in the Securities Class Action also explained that producers could figure out the identities of companies and complexes in the reports because, not only did people in the poultry industry switch from company to company, but Agri Stats employees would also often go work for poultry producers after Agri Stats.  Specifically, Larry Higdem, who worked at Agri Stats on the Pilgrim's account, later took a job at Pilgrim's. The Securities Class Action's confidential witness said that Higdem knew all of the numbers for all of Pilgrim's competitors and their complexes, and may have even taken the master list with him over to Pilgrim's. Again, because those identifying numbers never changed, Higdem would always know the competitors' numbers.

103.     Beyond the ability to discern company identities from the data itself, Agri Stats employees would meet with its clients and, in some cases, help them unveil the companies in the reports. The above confidential witness referenced in the Securities Class Action noted that Agri Stats representatives would frequently meet with Broiler producer executives and make detailed presentations on a quarterly basis. In fact, according the Securities Class Action, the confidential witness prepared many of the graphs and demonstratives used in these presentations. Agri Stats representatives would provide the names of companies to executives if pressed, noting that "sales people would have given up their first born to keep a subscriber."

104.     Agri Stats employees would also give guidance to its subscribers' executives as to just how much the market was over or undersupplied with chicken, which allowed the companies to adjust their production output. In *Adams v. Pilgrim's Pride*, one of the Company's experts testified that Agri Stats personnel told Pilgrim's in 2008 that "the industry [was] approximately 5

percent over supplied [and that Pilgrim's] production account[ed] for approximately 50% of this oversupply." Furthermore, when asked how much Agri Stats understood about the poultry industry's supply and production dynamics and specifically whether the Broiler industry would seek to capture the market share lost by Pilgrim's as a result of its bankruptcy in 2009, the expert responded: "[p]robably no one in the industry would know better than Agri Stats Vice President and economist Mike Donohue because…Agri Stats…is the company that gathers operating statistics from virtually every company in the chicken industry. And they know definitively how many breeders are out there, how many pullets are out there, how many Broilers are produced every week, and head count and pounds, everything else. They have massive amounts of statistics. And that's why they're so effective at reporting all of this [product information]."

105.    The enormous universe of company-specific information received in near real-time by Pilgrim's and other industry participants (including, at minimum, Tyson and Sanderson) from Agri Stats, enabled these companies to constantly monitor almost every aspect of one another's business and ensure that no company was "cheating" on their agreement to limit production. According to Professor Carstensen, the Agri Stats information sharing service effectively created a cartel in allowing the Broiler producers to make sure everyone was following through on the agreement: "[t]his is one of the ways you do it. You make sure that your co-conspirators have the kind of information that gives them confidence—so they can trust you, that you're not cheating on them. That is what creates stability for a cartel."

106.    In essence, Agri Stats created a new forum for the industry's old roundtable conference calls that were previously found in violation of antitrust laws back in 1979.  Indeed, the FTC and DOJ's joint "Antitrust Guidelines For Collaborations Among Competitors," issued in April 2000 and still followed today, indicates that the information exchanged through Agri

Stats reports is well-beyond the permissible scope of information shared between competitors. Specifically, the Guidelines discuss the following criteria for information sharing that raises serious antitrust concerns:

> i. Competitor collaborations also may facilitate explicit or tacit collusion through facilitating practices such as the exchange or disclosure of ***competitively sensitive information*** or through ***increased market concentration***;
>
> ii. The sharing of information ***relating to price, output, costs, or strategic planning*** is more likely to raise competitive concern that the sharing of information relating to less competitively sensitive variables;
>
> iii. The sharing of information on ***current operating and future business plans*** is more likely to raise concerns that the sharing of historical information; and
>
> iv. The sharing of ***individual company data*** is more likely to raise concern that the sharing of aggregated data that does not permit recipients to identify individual firm data.

(Emphasis Added).

107.    The content of the Agri Stats reports, the manner in which they were shared, and the circumstances of the Broiler industry meet each of these criteria, strongly suggest impermissibly anticompetitive behavior. As to the first factor, the information exchanged through Agri Stats is competitively sensitive, and described as one Broiler producer as "proprietary, privileged, and is also confidential business/financial information not subject to disclosure." Moreover, the market for Broilers is highly concentrated, with Tyson, Pilgrim's and Sanderson alone accounting for nearly half the country's production. Second, as stated in the Securities Class Action (and as described therein by a former Agri Stats employee and confirmed by former Pilgrim's employees and a Bloomberg reporter who had seen one of them), the Agri Stats reports cover nearly every conceivable metric in the Broiler industry, including information relating to price, output, costs, and strategic planning. Third, the information contained in the Agri Stats reports is not only historical, but also current and forward-looking because it reports,

among other things, information regarding breeder chickens and plant capacity, thereby enabling companies to project how much chicken their competitors will produce in the future. Fourth, and finally, Agri Stats reports not only share individual company data versus aggregated industry data, but also make it possible for its subscribers to determine the identities of those individual companies (when, that is, Agri Stats employees do not simply tell their clients the company to which a set of data belongs).

108.    Because of the vital importance of this information-sharing service to the Broiler industry and the price-fixing scheme alleged herein, Agri Stats has assumed a prominent role in the Broiler industry, such that on at least two occasions in the last eight years, a representative from Agri Stats has been elected to the board of the NCC.

### Pilgrim's and Other Broiler Producers Coordinate Production Cuts from 2008 through the Relevant Period to Raise Broiler Prices

109.    During the Relevant Period, between February 21, 2014 and November 17, 2016, defendants convinced investors with materially false statements and assurances that, through implementation of company-specific operational improvements and a new business approach over the previous several years, Pilgrim's had escaped the uncertain and risky boom and bust Broiler environment, and that sustained profitability was the new norm. In reality, Pilgrim's colluded with other Broiler producers starting in 2008—when a particularly low trough in the ordinary business cycle brought industry participants together—to systematically reduce the supply of Broilers in order to increase and maintain high prices to increase profit margins.

110.    Pilgrim's and other collaborating Broiler producers conducted two large coordinated production cuts: the first in 2008 to early 2009, and the second in 2011 through 2012. The production cuts by Pilgrim's and other Broiler producers took a number of different forms, such as:

i. Reducing egg sets or egg placements (breaking eggs before placement in incubators);

ii. Reducing the size of broiler breeder flocks;

iii. Pulling eggs (destroying eggs already set in incubators);

iv. Destroying chicks;

v. Reducing chicks sent to contract farmers;

vi. Increasing pickup/delivery days between flocks;

vii. Changes to facility production, such as temporary or permanent shut-downs; and

viii. Exporting hatching eggs or chicks.

111.    Many of these methods of decreasing production cause short-term supply cuts, which would still allow a Broiler producer to quickly increase production to take advantage of a price spike. Pilgrim's employees explained that during this time and throughout the Relevant Period the Company regularly used short-term methods to reduce the production of Broilers. One confidential witness in the Securities Class Action, Pilgrim's Executive Vice President of National Accounts from July 2010 to July 2013 (who had also worked for Tyson between 1989 and 2005), explained that Pilgrim's would consistently break eggs to reduce supply. The confidential witness explained that to increase the price of Broilers, all companies had to do was break eggs and reduce supply. When eggs were broken it caused plants to not run at capacity, and through Agri Stats, other companies could see when plants were not running at capacity. If plants were not running at capacity, they would have to be closed, so there was a correlation between breaking eggs and closing plants.

112.    The two large production cuts of 2008-09 and 2011-12 did not just reduce Broiler supply for the short term, however. Facilitated by the industry transparency provided in Agri Stats reports, Pilgrim's and other Broiler producers took the unprecedented step of reducing

Broiler breeder flocks without replenishing them. Historically, producers would avoid any actions that would impact future production, as that would leave them unable to capture the opportunity to sell Broilers at high margin when market conditions improved and therefore result in a competitive disadvantage. Agri Stats gave Pilgrim's and its co-conspirators the ability to monitor one another and be assured that none of their former competitors would surge production while prices were inflated.

113.    The efforts of Pilgrim's and other Broiler producers to keep supply low and maintain high prices created an artificial stabilization in the industry even during a time of soaring feed costs. During the Relevant Period, when Pilgrim's profit margins were consistently in double-figures—something that Pilgrim's nor any other poultry producers could achieve in the past—defendants falsely assured investors that this stabilization was attributable to the implementation of its legitimate business strategy over the previous years, but this was not true.

**Pilgrim's and Other Broiler Companies Undertake Additional Efforts During the Relevant Period to Manipulate Broiler Prices**

114.    At the start of the Relevant Period, Pilgrim's began reporting record earnings. For example, on the first day of the Relevant Period during a February 21, 2014 earnings call, defendant Lovette provided investors and analysts with the following explanation of the abrupt turnaround:

> I think the one thing that creates…has created that stability is the discipline of the industry to not allow profitability in the past to drive supplies in the future. I think we all have an understanding that our industry is mature, especially in the U.S. Consumption of total meat in the last five years has not grown and our growth in the future is going to come from markets outside the U.S. And so, we have a different model today than we had 15…10 or 15 years ago in that consumption in this country is not growing as robustly as it used to. And I think that discipline really, Ken, is the one ingredient that has made for more stable earnings that we have seen.

115.    At an industry conference a month later on March 12, 2014, Tyson CEO Donnie

Smith stated that "[a] 'meaningful change' in bird production won't occur until the second half of 2015." Like defendant Lovette, Smith was able to confidently prognosticate the industry's future production because he knew that the drastic reductions in breeder flocks during 2011 and 2012 had long term effects that made it impossible for Tyson, Pilgrim's, and the rest of the major Broiler producers to ramp up production for as much as another full year. Indeed, Smith reiterated his confidence a few months later on July 28, 2014, when he said that it was "physiologically impossible to get a whole lot more supply on this market" before July of the following year.

116.    On October 1, 2014, CoBank, a national cooperative bank serving rural industries such as agribusiness, water, and rural power, published a report on the Broiler industry, which confirmed that even in conditions that would ordinarily result in a production spike in Broilers, the industry was maintaining low supply and the 2011-12 cuts made it impossible to increase production for over a year:

> Broiler product demand should remain robust through the rest of this year and well into 2015, bolstered by a gradually improving domestic economy, continued strength in export demand, and the towering prices of beef and pork. Broiler production, however, has been slow to respond … Broiler meat production is on track to grow just 1.5 percent in 2014 from a year ago, with a similarly modest gain expected for 2015. Producers have been somewhat constrained in their attempts to expand the nation's chicken flock by the limited supply of Broiler hatching eggs. When the Broiler-producing industry reduced production in 2011 and 2012, the hatchery supply flock was also reduced, and it has not yet been rebuilt to prior levels …significant growth in Broiler production will not materialize until late-2015 or early-2016.

117.    In fact, as market signs began to point towards the possibility of increased production in 2014, and already constrained breeder flocks made it difficult to further reduce breeder levels, Pilgrim's and other industry participants undertook additional measures to keep Broiler prices high, such as by increasing exports to Mexico and manipulating the Georgia Dock

pricing index.

118.    First, Pilgrim's and its competitors justified exports due to a 2013-14 avian flu outbreak in Mexico, where they exported hatchery flocks purportedly to repopulate Mexican flocks. For example, soon after executives from Pilgrim's, Tyson and other companies attended the Urner Barry Executive Conference at Caesar's Palace in Las Vegas on April 26-28, 2015, on May 4, 2015, Tyson noted that it was sending 3% of its eggs to Mexico to "fill incubators." In an earnings call on July 28, 2016, defendant Lovette explained that Pilgrim's also exported eggs for the specific purpose of limiting domestic production, noting his "confidence that we're going to do the right thing with respect to maintaining [] discipline. We've certainly had the hatching egg supply to grow much more if we chose not to export those eggs. I think in May we exported 81 million hatching eggs or so outside of the country. The industry could have chosen to set some of those eggs domestically, but that was not the choice that was made. And so again that gives us confidence that we're going to continue to be disciplined as an industry."

119.    In 2015, the avian flu moved its way into the United States. While the turkey and table egg industries were both heavily impacted by the U.S. avian flu, the Broiler industry was largely unaffected; however, it did cause temporary bans on exports of Broilers to certain countries including China and Korea. As a result of the export limitations, frozen Broiler inventories in the U.S. began to build up, which in turn, began to threaten the stability of Broiler prices that Pilgrim's and its peers had collaboratively worked so hard to maintain since 2008.

120.    In response, the industry again cut production. Broiler industry analyst Heather Jones of BB&T Capital Markets noted in late 2015 that, to limit supply in the wake of the avian flu outbreak, producers would have to break eggs rather than set them.

121.    Tyson also joined in the efforts to limit production during mid-late 2015,

announcing in May 2015 the closure of its Buena Vista, Georgia Broiler plant, that it would eliminate a shift at its Dawson, Georgia plant, and that it would further reduce its production after July 2015 and keep it flat through 2016 by increasing purchases from competitors using its Buy vs. Grow strategy.

122.   In addition to these production cuts, Pilgrim's and other producers worked in concert to dump excess inventories of Broilers in foreign markets such as Vietnam in an effort to keep Broiler prices high in the U.S. As a result, in October 2015, Vietnam launched an inquiry into U.S. Broiler company dumping practices, which Vietnamese Broiler producers determined cost their industry over $120 million in the preceding 16 months. In fact, a September 2015 report by Vietnam's Southeast Livestock Association stated that U.S. Broiler companies were selling chicken thighs in Vietnam for 29% of the price they were sold in the U.S. market.

**Pilgrim's and Other Broiler Companies Manipulated the Georgia Dock
Pricing Index During the Relevant Period**

123.   In addition to using Agri Stats and other methods to coordinate reductions in Broiler production to raise prices, Pilgrim's and other industry participants kept prices high by manipulating the GDA Georgia Dock Broiler pricing index.

124.   There are three primary indices that track Broiler prices: Urner Barry, the USDA, and the Georgia Dock. Agri Stats also collects detailed pricing information through its subsidiary, Express Markets, Inc.

125.   Urner Barry collects and publishes daily price information for Broilers, while the USDA does it on a weekly basis. Both of these pricing indices are based on a system of double verification, which includes telephonic and written pricing surveys from all or nearly all Broiler producers, and then a verification of the reported prices from brokers and customers.

126.   In contrast to Urner Barry and the USDA indices, the Georgia Dock does not

require verification of the pricing figures that Broiler producers report to the GDA. The Georgia Dock, compiled since 1966, has been used by producers and others for decades as a benchmark to set Broiler prices and is considered the most influential of all the indices as it directly influences prices for roughly 25% of the entire U.S. Broiler market. When Broiler buyers—such as grocery store chains—and Broiler producers—such as Pilgrim's—negotiate their contracts for Broilers, the Georgia Dock is usually the first place they start for pricing. For Pilgrim's, who has told financial analysts that about 50% of its Broiler production sales go to grocery stores, the Georgia Dock price is critically important. Cameron Bruett, a spokesperson for JBS, Pilgrim's parent company, stated to the New York Times: "Given the scale and obvious importance of the poultry industry in the state of Georgia, the poultry market data provided by the Georgia Department of Agriculture has long served as a critical price discovery tool for producers, processors, distributors and retailers in Georgia and nationwide.

127.    According to an internal GDA document provided to the New York Times through an open records request for the November 3, 2016 article, "You Might Be Paying Too Much for Your Chicken," the Georgia Dock price index is compiled through weekly telephone calls from the GDA to the top nine to ten Broiler producers in the state, during which time the Broiler producers report the price offered to companies, such as grocery stores, with whom they have contracts. The single price reported by the Broiler producer company is accepted without any verification of actual invoices or any verification with purchasers.

128.    While the Georgia Dock and USDA prices are publicly available, the Urner Barry is private and subscription based. The chart below illustrates Broiler prices from 2007 through 2016 according to the three indices.



129.   As shown above, the Urner Berry and USDA indices—which both require secondary verification through sales receipts or discussions with purchasers—follow the same peaks and valleys from 2007 through 2016, and nearly mirror each other from 2013 through 2016. By contrast, the Georgia Dock price, which is higher than the other two indices for nearly every day during this 9 to 10 year span, diverges sharply in 2011-2012 and during the Relevant Period, from 2014 through the end of 2016. The low prices on the USDA and Urner Berry indices during this latter period, especially during the latter half of 2015 and the beginning of 2016, make perfect sense as feed prices during this time were the lowest seen in a decade (according to Pilgrim's quarterly filings, during the fourth quarter of 2015 and first quarter of 2016, the highest Pilgrim's paid for a bushel of corn was $3.98 and $3.73, respectively, as compared with the first quarter of 2013, when Pilgrim's paid as much as $7.41 per bushel).

130.    The high prices exhibited in the Georgia Dock raised many questions regarding the accuracy of numbers being reported to the Georgia Department of Agriculture, and which, again, were not subject to secondary verification.

**A Georgia Dock Insider Reveals Inaccuracy and Lack of Independence**

131.    On November 3, 2016, a *New York Times* article entitled "You Might Be Paying Too Much for Your Chicken" drew attention to the price discrepancy between the Georgia Dock and other two indices, noting that "[t]his week, the market price of a 2½- to 3½-pound Broiler on the Georgia dock was $1.10 per pound" while "[t]he Urner Barry index, as it is called, priced the same size chicken at 72 cents a pound," and according to the USDA, the "price this week was 71 cents a pound, nearly matching the price set by Urner Barry." The article also describes communications from the USDA to Arty Schronce, the director of the Georgia Dock for the GDA's Poultry Market News division, who was tasked with calling Broiler company facility managers to calculate the price for 2½- to 3½-pound Broilers on the Georgia Dock. The USDA informed Mr. Schronce that, in order for the Georgia Dock price to remain on the USDA's weekly report, the Georgia Dock needed to start verifying the prices producers were giving them. In a subsequent email sent to Gary Black, Georgia's agriculture commissioner, the Georgia Dock department admitted that it could not verify the pricing numbers being used to compile the Georgia Dock index, and that the Georgia Dock department "is in agreement with the poultry industry that there is no desire to review invoices for verification of data reported."

132.    On November 17, 2016, the *Washington Post* reported an article entitled "If You Thought You Were Paying Fair Prices For Chicken At The Supermarket, Think Again." The article sheds further light on the inaccuracy of the Georgia Dock and the manner in which the Broiler industry was manipulating it. The article included a link to a September 2016 internal

memorandum prepared by Mr. Schronce (the "Schronce Memo"), which is reproduced below, in

pertinent part.

Notes for meeting
Problems with Georgia Poultry Market News

*I continue to have concerns about the Poultry Market News (PMN). I voiced concerns in the past. However, I think it is time to reevaluate and examine PMN and to consider eliminating it. I see it as a flawed product that is a liability to the Georgia Department of Agriculture.*

There has been an unacceptable decrease of knowledge and experience in the Georgia Department of Agriculture Poultry Market News Office.

Background
The office went from four employees to two employees, one of which was a clerk who never received any actual training regarding markets, prices or the poultry industry. At this point, duties and procedures were streamlined to allow only two people to continue to put out the reports. This streamlining took away some of the precision and accuracy of the reports. After the unexpected death of Greg Pilowicz, the clerk handled the office duties and to put out reports for months using what knowledge she had. I was brought in to fill the empty spot while continuing to handle most previous responsibilities. My training was inadequate, inconsistent and sometimes in error. A former employee who had retired many years ago was brought in to teach me. His attendance was sporadic at best. The only thing consistent about his instruction was that the PMN needed at least two more people and everything needed to be done the way it was 20 years earlier. He was unwilling to accept that both poultry companies and the Georgia Poultry Market News had changed.

Diminished knowledge, experience and concern among poultry companies

I saw there was a diminished knowledge among most poultry company representatives from what the former employee expected and continued to tell me I could receive.

*I often received lackadaisical and rude responses to my requests for information. (i.e. "just keep 'em the same," "hurry up, hurry up" and unreturned phone calls.)* I have noticed over the years I have been handling PMN that there seems to be a further diminishing knowledge-experience base among the poultry company representatives. Someone was laid off and no one was trained to take that person's place. The replacement is not as knowledgeable or reliable. On one occasion, the replacement has been replaced....

***In spite of these changes, people still look at the PMN as if it is the same as it was 20 years ago. Clearly, it is not.***

I was told that poultry companies know what they are doing and all I need to do is to gather and consolidate the info I am provided. However, ***I have come to question the validity of some of the information provided.*** Some companies appear to be riding on the coattails of other companies. That is to say that the companies that are providing accurate and valid information are keeping PMN figures reasonable and explainable. At some point the iceberg is going to flip if has not already.

***As an example, I do not think I am getting actual weighted average prices from some companies.*** Streamlining, lack of understanding, etc.

There is increased media, public and legal scrutiny of the PMN. Some of this was addressed in the Wall Street Journal (WSJ) article. A recent example is the call from the financial investigator and two of his "researchers" at the antitrust division of the Florida Attorney General's office.

***I think I have had more questions about PMN in the past 6 months than in all the previous time I have worked in this office.***

The purpose of the PMN and its numbers are not understood by the public or the media.

***After a request for all info supplied by poultry companies, the confidentiality agreement was discussed with poultry companies. Shortly thereafter, a major company ([REDACTED]) stopped participating in the PMN. The representative would not provide a reason and neither would the vice president. The president never returned my phone call. (However, I would be surprised if they are not still utilizing the PMN but now bear no responsibility and are not in danger of having company figures and strategy made public.)***

***After that WSJ article, another company appears to basically not take part in the Whole Bird Dock Price process. They seem to deliberately submit a low bid that they know will be kicked out. However, they can claim that they are submitting something lower. In essence, they can take advantage of a high whole bird price while maintaining that they want it to be lower.***

***[REDACTED] (the largest of the poultry companies) now has a larger, even outsized, role in determining the Georgia Whole Bird Dock Price. It also has the largest role in establishing the price of all the parts as it is the largest producer of all parts except thigh meat. On three parts it far outranks the other companies.***

*I have questions about the "Advisory Board" and its role over an office of a state regulatory agency that is supposed to be independent. I was told I could not make any changes without clearing them with the Advisory Board.*

I have done my best to keep the PMN valid. I took and continue to take this job very seriously. However, my concern and my efforts can no longer overcome the diminished knowledge and experience and the inadequate staffing of both the Georgia Department of Agriculture and the reporting poultry companies.

In regard to the PMN, the poultry companies
1) Bear none of the costs
2) Do none of the work
3) Bear none of the responsibilities or scrutiny including answering questions from the public, food companies and the media
4) Get all the benefits from it as PMN prices are seen as more stable and higher than other markets.

Possible solutions:
1) ***Shut down the PMN.***
2) Transfer the PMN to the Georgia Poultry Federation where economists and an independent auditor can give it the attention it deserves
3) Discontinue PMN except for the whole bird dock price. Let this also be handled by the Georgia Poultry Federation or an independent entity.

(Emphasis Added).

133.    The Schronce Memo includes devastating revelations scrutinizing the reliability of the Georgia Dock, its independence, and the manner in which he believed poultry producers were manipulating the price and benefiting from the inflated values. Mr. Schronce wrote that he "continue[d] to have concerns" about the Georgia Dock, had "voiced concerns in the past," and that he thought the Georgia Dock price index was "a flawed product that is a liability to the Georgia Department of Agriculture." He also stated: "I was told that poultry companies know what they are doing and all I need to do is to gather and consolidate the info I am provided. However, I have come to question the validity of some of the information provided." Mr. Schronce specifically pointed to the time during the Relevant Period when the price of the Georgia Dock diverged most sharply from the other indices, noting, "I think I have had more questions about PMN in the past 6 months than in all the previous time I have worked in this

office." Furthermore, Broiler companies reporting prices would give him "lackadaisical and rude responses to my requests for information," such as responding "just keep em' the same" when asked for a company's Broiler price.

134.    Mr. Schronce raises several issues regarding the purported independence of Georgia Dock's pricing procedures. First, he draws attention to the independence of the Advisory Committee that oversees the Georgia Dock. While the identities of members of this committee are not publicly disclosed, plaintiffs in the *Maplevale* Action uncovered the following eight individuals who recently served on the board: Jayson Penn (Pilgrim's Executive Vice President of Sales & Operations), Vernon Owenby (Tyson's Plant Manager), Gus Arrendale (CEO of Fieldale Farms), Mike Welch (CEO and President of Harrison Poultry), Jerry Lane (Former CEO of Claxton Poultry), Pete Martin (Vice President of Operations at Mar-Jac), Steve Clever (Vice President of Fresh Sales at Wayne Farms), and Dale Tolbert (Vice President of Sales at Koch Foods).

135.    Given that the Advisory Committee was comprised of industry insiders who benefitted from a high Georgia Dock price, Schronce stated: "I have questions about the 'Advisory Board' and its role over an office of a state regulatory agency that is supposed to be independent. I was told I could not make any changes without clearing them with the Advisory Board." Moreover, all of the members were appointed by Gary Black, who, prior to his appointment as Georgia's Agriculture Commissioner, was a poultry industry lobbyist for decades.

136.    Further, the Schronce Memo reveals how at least one Broiler company was gaming the Georgia Dock's "One Cent Rule." To calculate the price used in the index, the GDA would make a preliminary calculation based on the single price quotation from each of the nine

to ten companies participating in the survey, and then would "smooth" the results by eliminating the outliers: any responses that are either one cent per pound above or below the weighted average are removed from the index. According to the GDA, the One Cent Rule is meant "to shield [] one company having the ability to greatly influence the price up or down." Per Schronce, one "company appears to basically not take part in the Whole Bird Dock Price process. They seem to deliberately submit a low bid that they know will be kicked out. However, they can claim that they are submitting something lower. In essence, they can take advantage of a high whole bird price while maintaining that they want it to be lower." Additionally, despite the One Cent Rule's goal to ensure one company does not "greatly influence" the index, Schronce states that "(the largest of the poultry companies) [presumably Tyson] now has a larger, even outsized, role in determining the Georgia Whole Bird Dock Price. It also has the largest role in establishing the price of all the parts as it is the largest producer of all parts except thigh meat. On three parts it far outranks the other companies."

137. Finally, the Schronce Memo indicates that Broiler companies were trying to distance themselves from the Georgia Dock after the release of news reports questioning its accuracy, but, as Mr. Schronce noted, he "would be surprised if they are not still utilizing the PMN but now bear no responsibility and are not in danger of having company figures and strategy made public."

**The GDA Coordinated with the Poultry Industry to Respond to USDA Inquiry**

138. On November 3, 2016 and on November 8, 2016, respectively, *The New York Times* and Washington Post reported based upon documents received through Freedom of Information Act requests for USDA and GDA documents, the GDA worked in concert with the poultry industry to respond to a USDA inquiry into the verifiability of the Georgia Dock price

46

index. In the months before Mr. Schronce prepared his memorandum, the USDA had started to take a closer look at the Georgia Dock and the GDA's procedures used in compiling it. On July 19-20, 2016, USDA officials met with GDA representatives in Atlanta to discuss price discrepancies between the Georgia Dock and its index and requested that the GDA provide them with actual data from the Broiler producers by August 5, 2016, so that they could "test and review" the Georgia Dock for accuracy.

139.    In response to the USDA inquiry, officials within the GDA started to raise antitrust concerns regarding the Georgia Dock. A July 27, 2016 draft report from Alec Asbridge, GDA Director of Regulatory Compliance & Budget, to GDA Commissioner Gary Black concluded that "[t]he top 10 poultry producing companies now control over 80% of the industry output. The combination of vertical integration, limited competition and lowered production periods has led to steady prices that have shown to be fairly resistant to changing market conditions. These factors alone illicit [sic] anti-trust review." Furthermore, the report noted that Broiler producers "report[] a weighted average price per pound on broilers based of contracts that have been determined at the private level and reported without regulatory oversight. The formulas to calculate weighted average prices have been determined on the private level and have not been standardized since the inception of the [Georgia Dock] in 1968, which there is no written record of." In other words, the Broiler industry was unilaterally creating the formulas and setting the price for the Georgia Dock, not the GDA.

140.    In conclusion, Director Asbridge determined that, given the prevailing use of the Georgia Dock within the global poultry market, additional procedures would need to be established in order to foster transparency and accuracy for the Georgia Dock index:

> The extent of the use of the [Georgia Dock] in price contract negotiations is presently unknown but inquiries made by media and other governmental entities

indicate that it is utilized on a more regular basis than previously expected. If the global poultry industry has relied on the [Georgia Dock] as if it represents something similar to a contracts future price on a regulated market then the [Georgia Dock's] contribution to the global poultry market is more significant than thought. If GDA decides to continue with the publication of the PMN and continue with a calculation of the [Georgia Dock] it is necessary to come to a clear and justifiable formula in which individual companies can utilize to report their weighted average prices. This formula will need to use standard inputs for companies in order to output a standardized value that is representative of contract prices. Weighted average formulas will need to be transparent and verifiable based on overall slaughter volumes.

141.    The following week, on August 5, 2016, Asbridge sent a highly sanitized version of his report to Commissioner Black with a cover email, stating: "I kept going back and forth on particular wording to navigate what we talked about. I've also included a few recommendations that you can choose to share with [Georgia Poultry Federation President] Mike [Giles] if you want." The revised report deleted all references to factors in the Broiler industry eliciting "antitrust review," and the significant fact that the Georgia Dock price had been reported for decades by the GDA "without regulatory oversight."

142.    Asbridge then sent the sanitized version of the report to Poultry Federation President Giles on August 12, 2016, allowing the Broiler industry to influence the GDA's response to the USDA. The cover email stated:

> Thanks again for arranging everything last week….If you could review [the attached] to ensure what I presented *is accurate and best represents industry's* **concern** with only reporting a spot price.  *Once you have reviewed we can move forward with sending to USDA and take the next steps.*

(Emphasis added).

Meanwhile, the GDA failed to comply by the USDA's August 5 deadline and the USDA pulled all Georgia Dock price information from its Broiler Market News Report.

143.    Another email from Asbridge to Giles that same day reiterated that the GDA "tried to capture the concerns the producers had when we met" and contained some "possible

routes forward" for responding to the USDA. In stark contrast to Asbridge's initial report that described various industry factors that elicited "anti-trust review" and concerns regarding the manner in which the GDA calculated its prices, including a need to be "transparent and verifiable," Asbridge now wrote that "[t]he GDA is in agreement with the poultry industry that there is no desire to review invoices for verification of data reported," and that "the GDA does not wish to request any trade secrets," even though those trade secrets were currently being exchanged and verified with ease through Agri Stats. According to an email dated August 24, 2016, Giles left a message for Asbridge giving "his and industry's sign off on the dock price summary report. We can move forward sending to the USDA."

144.    According to the November 8, 2016 article published by *The Washington Post*, the USDA commented that "they discontinued publishing the Georgia Dock price 'when data from the source report could not be independently verified.'" With public concern mounting due to *The New York Times* and *The Washington Post* articles reporting the Schronce Memo and GDA-poultry industry collusion, the GDA eventually broke with the Broiler industry in late 2016 and instituted a requirement that participating Broiler producers sign affidavits certifying the prices quoted to Georgia state officials for the Georgia Dock. Tellingly, the Broiler industry refused to comply.

145.    As a result, on December 21, 2016, the GDA announced that it would cease publication of the Georgia Dock "due to lack of submissions [to] the new requirements [for verification]" and because of a "significant reduction" in participation by poultry producers. The GDA would later announce the launch of a new index called the "Georgia Premium Poultry Price Index" with a more transparent and verifiable reporting structure, but the new index failed to gain the necessary support within the industry. On February 28, 2017, the GDA announced

that, "[d]ue to a lack of available data, the Georgia Department of Agriculture will cease its efforts to publish the Georgia Premium Poultry Index."

**Materially Misleading Statements and/or Material Omissions During the Relevant Period**

146.    On February 20, 2014, Pilgrim's issued a press release announcing its financial results for the fourth quarter and full year 2013.  The press release stated, in pertinent part:

**Pilgrim's Pride Reports EBITDA of $196.5 Million with a Margin of 9.6% for the Fourth Quarter of 2013, and EBITDA of $800.4 Million with a Margin of 9.5% for the Full Year**

GREELEY, Colo., February 20, 2014 – Pilgrim's Pride Corporation (NASDAQ: PPC) reports fourth quarter 2013 financial results with net sales of $2.05 billion for the thirteen week period, as compared to $2.2 billion for the fourteen week period in 2012. Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") of $196.5 million increased 205% compared to the $64.4 million generated in the prior year. Net income of $143.4 million reflected an improvement of 529% compared to the $22.8 million reported in the same period in 2012, with diluted earnings per share reaching $0.55 compared to $0.09 in the fourth quarter of 2012.

For the full 2013 fiscal year, Pilgrim's achieved $8.4 billion in net sales and $800.4 million of EBITDA, resulting in an EBITDA margin of 9.5%. Pilgrim's recognized $549.6 million in net income for the full year with net income of $2.12 per weighted average share, demonstrating consistently solid performance over the entire year.

147.    In the February 20, 2014 press release, defendant Lovette – the Company's CEO – stated:

Three years ago our company began executing a strategy to create shareholder value and improve capital structure by partnering with key customers, relentless pursuit of operational excellence and growing our value added exports. During this period, we grew our sales by 22% while increasing our profitability, clearly demonstrating that this strategy is working as evidenced by this year's strong free cash flow generation

148.    On February 21, 2014, Pilgrim's filed its annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended

December 31, 2013 (the "2013 10-K").  The 2013 10-K stated, in pertinent part:

*Competitive Conditions*

The chicken industry is highly competitive. We are one of the largest chicken producers in the world and we believe our relationship with JBS USA enhances our competitive position. In the U.S. and Mexico, we compete principally with other vertically integrated poultry companies. However, there is some competition with non-vertically integrated further processors in the U.S. prepared chicken business. We believe vertical integration generally provides significant, long-term cost and quality advantages over non-vertically integrated further processors.

In general, the competitive factors in the U.S. chicken industry include price, product quality, product development, brand identification, breadth of product line and customer service. Competitive factors vary by major market. In the U.S. retail market, we believe that product quality, brand awareness, customer service and price are the primary bases of competition. In the foodservice market, competition is based on consistent quality, product development, service and price. The export market is competitive on a global level based on price, product quality, product tailoring, brand identification and customer service. Competitive factors vary by market and may be impacted further by trade restrictions, sanitary and phyto- sanitary issues, brand awareness and the relative strength or weakness of the U.S. Dollar against local currencies. We believe that product customization, service and price are the most critical competitive factors for export sales.

149.    The 2013 10-K also stated:

**Profitability in the chicken industry is materially affected by** the commodity prices of feed ingredients and **market prices of chicken, which are determined by supply and demand factors**. As a result, the chicken industry is subject to cyclical earnings fluctuations.

(Emphasis added).

150.    The 2013 10-K was signed by defendants Tomazoni, Lovette, Bell, Cooper, Vasconcellos and Macaluso.  Further, the 2013 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by the defendants Lovette and Sandri, stating that the financial information contained in the 2013 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

151.    That same day, defendants Lovette and Sandri held a conference call with

investors to discuss Pilgrim's reported fourth quarter and full fiscal year 2013 results (the "Fiscal Year 2013 Earnings Call"), during which they spoke in detail about Pilgrim's margins, earnings, and net income. During the call, defendants made false statements regarding both Pilgrim's performance and the chicken industry in general, as well as the factors that contributed to Pilgrim's performance. For example, defendant Lovette touted the Company's "pricing strategy" and "spread business" as the bases of Pilgrim's growing margins:

> *We continued our approach of creating pricing models specific to our customers' needs to ensure they have the committed volumes and quality essential to their success.*

> \*      \*      \*

> We stayed with the same strategy that we had for 2013 going into that year in late 2012 by not focusing on a fixed price, 12 month fixed price contracts. The percentage of those is about the same as 2013, which was less than 5%. *Rather as we have said before [], we created a spread business, and I think the fourth quarter was a great demonstration for that, the fourth quarter 2013 that is*, and I would remind you to look at what feed cost did. Feed cost was down in a significant way but also pricing was down as well.

> So we kept our margin improving, as a result of that spread that we created. *We think that's the right strategy for our business and we'll continue to focus on our pricing strategy in that way.* So we feel like flowing through the P&L this year, if feed costs remain about where they are today and *pricing actually I think has a chance to be even stronger than it is today and I think that sets up a good environment for margin consideration through that spread.*

> \*      \*      \*

> We stayed with the same pricing strategy as we had going into 2013 as I mentioned because *again we believe that pricing is going to get stronger, as we move into the summertime and we think it will be solid even in the back half of the year. And so again keeping with the idea that we run more of a spread business today, we kept our pricing strategy such that we could follow the chicken markets.*

> *I still believe that the profitability of the chicken industry is based on the supply and demand of chicken, as opposed necessarily to the cost of feed.* I think 2013 was a great testament of that as we paid the highest prices for feed ingredients, as

we have in a long time. Yet the profitability of the industry was as good or better than it's been in a long time.

                              *        *        *

As we said late last year, we don't believe that the breeder stock or the parent stock supply chain is - exist today to grow significantly - the number of breeders and therefore the number of hatching eggs that it would take to grow in '14 over '13 in a significant way. And so that's why *we believe that the supply side of chicken will be conducive to relatively strong pricing as we go through the year.*

(Emphasis added).

152.    On March 31, 2014, the Company filed its proxy statement for 2014 with the SEC on Form DEF 14A (the "2014 Proxy").  The 2014 Proxy stated that the elements of compensation for the Company's executive officers consisted of, among other things, long term incentive compensation, based on the performance of the Company.  As such, defendants were awarded compensation based on the purported performance of the Company and its growing success based on the materially misleading statements and/or omissions concerning the price fixing scheme defendants engaged in.

153.    On April 30, 2014, Pilgrim's issued a press release announcing its financial results for the first quarter of 2014.  The press release stated, in pertinent part:

**Pilgrim's Pride Reports EBITDA of $203.5 Million and 10.1% EBITDA Margin for the First Quarter of 2014, An EBITDA Improvement of 87% Compared to 2013**

GREELEY, Colo., April 30, 2014 – Pilgrim's Pride Corporation (NASDAQ: PPC) reported first quarter 2014 earnings with Net Sales of $2.0 billion, Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") of $203.5 million, and Net Income of $98.1 million, resulting in Earnings Per Share of $0.38 for the quarter. These results compare to $2.0 billion in net sales, $116.9 million of EBITDA, and Net Income of $54.6 million, or Earnings Per Share of $0.21 for the same quarter in 2013.

154.    In the April 30, 2014 press release, defendant Lovette stated:

Consistent with the progress we've made for the past three years, we remain committed to

operational improvement year after year…We continue to execute against our strategy that combines focusing on key customers, relentless pursuit of operational excellence and growing value added exports while rapidly adapting to changing market conditions.

Our teams continue to raise the standard and drive accountability deeper into the organization, from cost control through the implementation of zero based budgets to gains in efficiency and superior mix management, providing us with a competitive advantage in the market.

155.    On May 1, 2014, Pilgrim's filed its quarterly report on Form 10-Q with the SEC

for the quarter ended March 31, 2014, which reiterated the information previously announced in

the Company's press release on April 30, 2014, stating in pertinent part:

> ***Despite strong demand in both the U.S. and Mexico for chicken products, our net sales were bridled by supply constraints caused by breeding flock reductions in prior years***. Based on current information available from the U.S. Department of Agriculture, supplies of all three major proteins—beef, pork and chicken—are currently constrained compared to prior years and we believe these conditions will continue until mid 2015. ***We also believe the industry does not currently possess the physical capability to rapidly increase production***. Consumer demand for chicken products, especially for tenders, small whole chickens and boneless, skinless breast portions, was strong in the thirteen weeks ended March 30, 2014 when compared to the same period in the prior year and remains strong as of the date of this report. Leg quarter demand also remains well supported in the thirteen weeks ended March 30, 2014 when compared to the same period in the prior year as boneless dark meat consumption has grown in the U.S. over the past year. ***The combination of strong demand and constrained supply has resulted in increased market prices for most chicken products***.

(Emphasis added).

156.    That same day, defendants Lovette and Sandri held a conference call with

investors to discuss Pilgrim's reported first quarter 2014 results (the "First Quarter 2014

Earnings Call"), during which they spoke in detail about Pilgrim's margins, earnings, and net

income. During the call, defendants made false statements regarding both Pilgrim's performance

and the chicken industry in general, as well as the factors that contributed to Pilgrim's

performance. Defendant Lovette repeated Pilgrim's representations regarding supply:

> ***As we've been saying for several quarters now, the entire supply chain of the U.S. industry has been constrained for a while***. Starting with breeders, due to the reduction in supply chain in previous years, we will continue to see some restrained supply, likely through to about mid-2015.

\*        \*        \*

At the same time, *we've experienced a strong price increase in breast meat, and even a shortage of product in the specific case of tenders.* Our net dock is now higher than at the same time last year, and *Georgia dock reached $1.08 per pound for the first time*. On that front, current demand is strong and shows no signs of letting up, especially for tenders, small wads and bone and skinless breast portions. Leg quarter demand remains well supported, with boneless dark meat consumption growing in the U.S. year-over-year. *Chicken remains the most competitively priced protein*, especially when compared to surging prices and lack of availability for other meats. The supply cycle for all 3 major proteins is strained now, and we anticipate this will continue until mid-2015.

(Emphasis added).

157.    On the same call, defendant Sandri stated that Pilgrim's "revenues of $2 billion were a product of our increasing strength over the course of the quarter. Despite market prices lower than last year, our mix and operational improvements, combined with the lower cost of input, allow us to significantly improve our grow margins."

158.    On July 30, 2014, Pilgrim's issued a press release announcing its financial results for the second quarter of 2014.  The press release stated, in pertinent part:

### Pilgrim's Pride Reports EBITDA of $338.6 Million and 15.5% EBITDA Margin, or 28% Growth Year over Year

GREELEY, Colo., July 30, 2014 - Pilgrim's Pride Corporation (NASDAQ: PPC) reported second quarter 2014 earnings with Net Sales of $2.19 billion, Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") of $338.6 million, and Net Income of $190.4 million, resulting in Earnings Per Share of $0.73 for the quarter. These results compare to $2.18 billion of Net Sales, $264.6 million of EBITDA and Net Income of $190.7 million, or Earnings Per Share of $0.74 for the second quarter of 2013.

159.    In the July 30, 2014 press release, defendant Lovette stated:

The margin strength we've demonstrated has been generated by capturing improvements in cost and sales mix, all rooted in operational excellence. This year we have found significant savings through our zero based budgeting process, and even now are identifying even more areas where we can drive efficiencies. Our team members are driven to be the best in class and produce results that will

result in long term, profitable growth.

160.    The following day, on July 31, 2014, Pilgrim's filed its quarterly report on Form 10-Q with the SEC for the quarter ended June 30, 2014, which reiterated the information previously announced in the Company's press release from the day before, and additionally stated, in pertinent part:

> Net sales generated in the thirteen weeks ended June 29, 2014 increased $2.7 million, or 0.1%, from net sales generated in the thirteen weeks ended June 30, 2013 primarily because of an increase in sales volume partially offset by a decrease in net sales per pound and the impact of foreign currency translation associated with our Mexico operations. **_The increase in sales volume_**, which **_resulted from strong demand in both the U.S. and Mexico for chicken products_**, contributed $59.1 million, or 2.7 percentage points, to the increase in net sales.
>
> \*        \*        \*
>
> **_Despite strong demand in both the U.S. and Mexico for chicken products, our net sales were hampered by supply constraints caused by breeding flock reductions in prior years._** Based on current information available from the U.S. Department of Agriculture, supplies of all three major proteins—beef, pork and chicken—are currently constrained compared to prior years and we believe these conditions will continue until mid-2015. **_We also believe the industry does not currently possess the physical capability to rapidly increase production._** Consumer demand for chicken products, especially for tenders, small whole chickens and boneless, skinless breast portions, was strong in the twenty-six weeks ended June 29, 2014 when compared to the same period in the prior year and remains strong as of the date of this report. Leg quarter demand also remains well supported in the twenty-six weeks ended June 29, 2014 when compared to the same period in the prior year as boneless dark meat consumption has grown in the U.S. over the past year. **_The combination of strong demand and constrained supply has resulted in increased market prices for most chicken products._**

(Emphasis added).

161.    The same day, defendants Lovette and Sandri held a conference call with investors to discuss Pilgrim's reported second quarter 2014 results (the "Second Quarter 2014 Earnings Call"), during which they spoke in detail about Pilgrim's margins, earnings, and net income. During the call, defendants made false statements regarding both Pilgrim's performance

and the chicken industry in general, as well as the factors that contributed to Pilgrim's performance. For example, defendant Lovette stated that "*[o]ur consistent margin performance is a direct result of the discipline we've demonstrated in applying our strategy*." (Emphasis added).

162.    In addition, defendant Lovette also stated:

Chicken markets have shown continued strength in the whole bird, with the second quarter reflective of healthy pricing across the board. *Demand pressures have held prices relatively strong* and we believe this will continue well into 2015. After a period where wings had a somewhat tepid pricing environment, we're seeing them strengthen once again. *Adding to that, the George Dock whole bird market continues to be at record levels.* It's important to recognize here that *Pilgrim's results don't just follow the full peaks and troughs of pricing trends. Our portfolio effect shields us from some of the lower prices, and the same time means we don't have the volatile spikes in pricing either*. The overall impact should be a more stable margin structure over time.

\*      \*      \*

It's hard to tell from year-to-year what feed ingredient costs are going to be, and separately, what the demand and supply for chickens are and, therefore, what prices are going to be.

(Emphasis added).

163.    On October 29, 2014, Pilgrim's issued a press release announcing its financial results for the quarter ended September 30, 2014.  The press release stated, in pertinent part:

**Pilgrim's Pride Reports EBITDA of $435 Million and 19.2% EBITDA Margin for the Third Quarter**

GREELEY, Colo., October 29, 2014 - Pilgrim's Pride Corporation (NASDAQ: PPC) reports third quarter 2014 earnings with Net Sales of $2.3 billion, Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") of $435.0 million, and Net Income of $256.0 million, resulting in diluted Earnings Per Share of $0.99 for the quarter. These results compare to Net Sales of $2.1 billion, Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") of $222.5 million, and Net Income of $160.9 million, resulting in diluted Earnings Per Share of $0.62 for the third quarter of 2013.

164.    In the October 29, 2014 press release, defendant Lovette stated:

Our third quarter results reflect the discipline that Pilgrim's has demonstrated in managing the variables within our control as well as the strength we've seen in the chicken markets…Our focus has been, and continues to be, the consistent execution of our strategy to be a valued partner to our key customers, relentless pursuit of operational excellence and value-added export growth.

165.   On October 30, 2014, Pilgrim's filed its quarterly report on Form 10-Q with the

SEC for the quarter ended September 30, 2014, which reiterated the information previously

announced in the October 29, 2014 press release, stating, in pertinent part:

Higher net sales per pound, which resulted from a slight shift in product mix toward higher-priced chicken products when compared to the same period in the prior year as well as the impact of Marek's disease on breeder flocks in Mexico, contributed $87.6 million, or 4.1% , to the increase in net sales. **The increase in sales volume,** which **resulted from strong demand in the U.S. for chicken products**, contributed $41.5 million, or 1.9 percentage points, to the increase in net sales.

\*       \*       \*

**Despite strong demand in both the U.S. and Mexico for chicken products, our net sales were hampered by supply constraints caused by breeding flock reductions in prior years.** Based on current information available from the U.S. Department of Agriculture, supplies of all three major proteins—beef, pork and chicken—are currently constrained compared to prior years, and we believe these conditions will continue until mid-2015. **We also believe the industry does not currently possess the physical capability to rapidly increase production.** Consumer demand for chicken products, especially for tenders, small whole chickens and boneless, skinless breast portions, was strong in the thirty-nine weeks ended September 28, 2014, when compared to the same period in the prior year and remains strong as of the date of this report. Leg quarter demand also remains well supported in the thirty-nine weeks ended September 28, 2014, when compared to the same period in the prior year as boneless dark meat consumption has grown in the U.S. over the past year. **The combination of strong demand and constrained supply has resulted in increased market prices for most chicken products.**

(Emphasis added).

166.   The same day, defendants Lovette and Sandri held a conference call with

investors to discuss Pilgrim's reported third quarter 2014 results (the "Third Quarter 2014

Earnings Call"), during which they spoke in detail about Pilgrim's margins, earnings, and net

income. During the call, defendants made materially false and misleading statements regarding both Pilgrim's performance and the chicken industry in general, as well as the factors that contributed to Pilgrim's performance. For example, defendant Lovette stated:

> Our business model is designed to ensure reliable supply of the quality products our customers expect, while creating an environment rewarding that consistency. ***Our portfolio model yields a diversified sales mix, ensuring we can adapt quickly to changes in market supply and mitigate market volatility***, while high spot prices to parts such as boneless skinless breast and wings benefit our large bird debone business. Some of our other businesses such as Prepared Foods benefit when those prices decline. ***We have given much critical thought in constructing our broad segment and product portfolio to yield a more consistent earnings stream as chicken supply and demand ebb and flow over long periods of time.***
>
> *            *            *
>
> ***Supplies remain very tight.*** We don't see that changing in 2015, even though, as I said in the remarks, there could be up to a 3% increase and we think that's back half loaded. ***We see demand staying very firm….So we see the same thing, strong environment for pricing, great demand for chicken now continuing in 2015 and we think that set's up for a great pricing environment***, coupled with what we see as declining feed cost going forward.
>
> *            *            *
>
> ***What I do know is I think our industry has come to realize that the profitability in the chicken business is driven by supply and demand of chicken***. In the past, we talked a lot about cost of corn and soy. We've talked about the changing from small birds to big birds. But ***at the end of the day, I think we have full realization that supply and demand for chicken is going to be the determining factor of pricing and ultimately profitability***. I don't see that changing any time soon.

(Emphasis added).

167.    On February 12, 2015, Pilgrim's issued a press release announcing its financial results for the quarter and year ended December 31, 2014.  The press release stated, in pertinent part:

**Pilgrim's Pride Reports Operating Income of $329 Million with a Margin of 15.5% for the Fourth Quarter of 2014, and $1,203 Million with a Margin of 14.0% for the Full Year**

GREELEY, Colo., February 11, 2015 (GLOBE NEWSWIRE) - Pilgrim's Pride Corporation (NASDAQ: PPC) reports fourth quarter 2014 financial results with Net Sales of $2.11 billion for the thirteen week period, as compared to $2.05 billion for the fourteen week period in 2013. Net Income of $167.2 million reflected $48 million adjustment due to the early retirement of the 2018 notes and a non-cash foreign exchange loss due to the Peso devaluation. The 2014 net income reflects an improvement of 17% compared to the $143.4 million reported in the same period in 2013. Adjusted Earnings Per Share reached $0.83 in the fourth quarter of 2014 compared to $0.55 in the same period last year, while adjusted Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") of $367.8 million increased 86% compared to the $196.6 million generated in the prior year.

For the full 2014 fiscal year, Pilgrim's recorded $8.58 billion in Net Sales and $1,352 million of adjusted EBITDA, a 15.8% margin. Pilgrim's recognized $711.7 million in Net Income for the full year with Earnings Per Share of $2.74, demonstrating consistently solid performance over the entire year.

168.    In the February 12, 2015 press release, defendant Lovette stated:

Though pleased with our results for 2014 and our team members deserve full credit, we will not be complacent. We continue driving ownership and accountability deeper in our company, and we are developing new tools and methods to improve our efficiency, sales mix, and margin…

We see 2015 as yet another opportunity for our team to create shareholder value through serving our key customers, relentless pursuit of operational excellence, and growing value added exports. As we begin the year, demand for chicken continues to be strong, outpacing supply, and with the improvements we've implemented, Pilgrim's is ideally situated to reap the benefits.

169.    Also on February 12, 2015, Pilgrim's filed its annual report on Form 10-K with the SEC for the quarter and year ended December 31, 2014 ("2014 10-K"). The 2014 10-K stated, in pertinent part:

**Competition**

The chicken industry is highly competitive. We are one of the largest chicken producers in the world and we believe our relationship with JBS USA enhances

our competitive position. In the U.S. and Mexico, we compete principally with other vertically integrated poultry companies. However, there is some competition with non-vertically integrated further processors in the U.S. prepared chicken business. We believe vertical integration generally provides significant, long-term cost and quality advantages over non-vertically integrated further processors.

In general, the competitive factors in the U.S. chicken industry include price, product quality, product development, brand identification, breadth of product line and customer service. Competitive factors vary by major market. In the U.S. retail market, we believe that product quality, brand awareness, customer service and price are the primary bases of competition. In the foodservice market, competition is based on consistent quality, product development, service and price. The export market is competitive on a global level based on price, product quality, product tailoring, brand identification and customer service. Competitive factors vary by market and may be impacted further by trade restrictions, sanitary and phyto- sanitary issues, brand awareness and the relative strength or weakness of the U.S. Dollar against local currencies. We believe that product customization, service and price are the most critical competitive factors for export sales.

170.    The 2014 10-K was signed by defendants Tomazoni, Lovette, Sandri, Bell, Cooper, Vasconcellos, Macaluso and Souza.    Further, the 2014 10-K contained signed certifications pursuant to SOX by the defendants Lovette and Sandri, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

171.    The same day, defendants Lovette and Sandri held a conference call with investors to discuss Pilgrim's reported fourth quarter and full fiscal year 2014 results (the "Fiscal Year 2014 Earnings Call"), during which they spoke in detail about Pilgrim's margins, earnings, and net income. During the call, defendants made false statements regarding both Pilgrim's performance and the chicken industry in general, as well as the factors that contributed to Pilgrim's performance. For example, defendant Lovette stated:

>    ***Demand continues outpace supply and our pricing and the industry pricing is reflective of that***…. So on the demand side, it looks very favorable for this year. On the supply side, one of the leading indicators that we always look at is our breeder supply….And then I looked at some numbers supplied by AgriStats earlier in the week and found some interesting facts. If you go back to 2008, the

industry slaughtered 8.35 billion head. And by 2011, that slaughtered head had declined by approximately 8% to 7.7 billion. And it's actually remained about that same level through 2014 at about 7.7 billion. If you look at live weight pounds produced, it was 47.1 billion in 2008. It declined to 45.06 billion in 2011. And in 2014, for the first time since 2008, it reached 47.3 billion, so only 200 million more pounds above 2008 levels. And then on the average weight side, the average weight in 2008 was 5.64, and it's averaged just above 6 from 2011 through 2014. *So with all of that data in mind, what it tells me is the industry remains fairly disciplined on the supply side and demand has been increasing for chicken against the backdrop of increasing beef and pork supplies.*

*       *       *

We think about [] '15 as another great opportunity as fundamentals so far are shaping up to provide another positive economic environment for poultry suppliers. *As we begin the year, demand for chicken has remained strong, outpacing supply. And with these improvements we've implemented, Pilgrim's is well positioned to reap the benefits. Thank you, all, for joining us today.*

(Emphasis added).

172.    On April 1, 2015, the Company filed its proxy statement for 2015 with the SEC on Form DEF 14A (the "2015 Proxy").   The 2015 Proxy stated that the elements of compensation for the Company's executive officers consisted of, among other things, long term incentive compensation, based on the performance of the Company.  As such, defendants were awarded compensation based on the purported performance of the Company and its growing success based on the materially misleading statements and/or omissions concerning the price fixing scheme defendants engaged in.

173.    On April 30, 2015, Pilgrim's Pride issued a press release announcing its financial results for the quarter ended March 31, 2015.  The press release stated, in pertinent part:

**Pilgrim's Pride Reports Operating Income of $328 Million with a Margin of 16.0% for the First Quarter of 2015, a Significant 95% Improvement Compared to 2014**

GREELEY, Colo., April 29, 2015 (GLOBE NEWSWIRE) - Pilgrim's Pride Corporation (NASDAQ: PPC) reports first quarter 2015 financial results with Net Sales of $2.05 billion for the thirteen week period, as compared to $2.02 billion

for the same period in 2014. The 2015 Q1 net income of $204.2 million was an improvement of 108% compared to the $98.1 million reported in the same period in 2014. Adjusted Earnings Per Share was $0.82 in the first quarter of 2015 compared to $0.39 in the same period last year, while adjusted Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") of $363.5 million, a 17.7% margin, increased 77% compared to the $205.5 million generated in the prior year.

174.    In the April 30, 2015, defendant Lovette stated:

We continue to execute well against our goals of focusing on key customers, relentless pursuit of operational excellence and growing value added exports. Our strong results are a testament to the benefits of our portfolio model, which we believe provide superior results with lower volatility than our peers over time. Our portfolio strategy also enables us to take advantage of differing conditions in various markets…

Our team members continue to be very motivated to set the highest standards and be more efficient in every aspect of our business. We are continuing our work on zero based budgeting and are on track to capture the identified operational improvements for 2015, which will strengthen our competitive advantage.

175.    Also on April 30, 2015, Pilgrim's filed its quarterly report on Form 10-Q with the SEC for the quarter ended March 31, 2015, which reiterated the information previously announced in the April 30, 2015 press release, stating:

Market prices for feed ingredients remain volatile. Consequently, ***there can be no assurance that our feed ingredients prices will not increase materially and that such increases would not negatively impact our financial position, results of operations and cash flow.***

\*        \*        \*

***Market prices for chicken products are currently at levels sufficient to offset the costs of feed ingredients. However, there can be no assurance that chicken prices will not decrease due to such factors as competition from other proteins and substitutions by consumers of non-protein foods because of uncertainty surrounding the general economy and unemployment.***

(Emphasis added).

176.    The same day, defendants Lovette and Sandri held a conference call with investors to discuss Pilgrim's first quarter 2015 results (the "First Quarter 2015 Earnings Call"),

during which they spoke in detail about Pilgrim's margins, earnings, and net income. During the

call, defendants made false statements regarding both Pilgrim's performance and the chicken

industry in general, as well as the factors that contributed to Pilgrim's performance. For example,

defendant Lovette stated:

> ***And we also think that the pricing from demand is going to be very strong, too.*** And the reason is, as I said before, from a supply standpoint, not much of the supply growth is coming from the growth in hen. And as there's only 2 wings on each bird, it's a piece count issue. And as wings continue to be well supported and demanded, the price continues to be very well supported. Tenders are the same way. There's only 2 tenders per head. And the same math works there in terms of price and demand. And we're seeing tremendous strength for tenders so far this year. And breast meat right now is very strong. We've seen, I think, $0.08 a pound increase just this week in Urner Barry quote. And the trading levels are at a basis that indicates that demand is very, very strong for breast meat. And we think that breast meat will continue to go up through Memorial Day. And as seasonally expected, maybe weaken a little bit in June before it starts making another run towards the 4th of July. ***So we see the patterns, at least, for breast meat, wings and tenders very similar to what happened last year. And we believe that that's good news from a margin standpoint for chicken producers and us as well.***
>
> \*     \*     \*
>
> ***Whole birds are very, very in demand and supported. I think the Georgia Dock is at an all-time high right now.*** It went up another 1/4 yesterday at 115.75. And we don't see any reason for demand for whole birds to trail off, at least, through Labor Day. And then as is normal, we see a seasonal decline. But as of right now, whole birds are stronger than they've been really in quite a while. We don't -- our outlook is that's not going to change.

(Emphasis added).

177.    On July 30, 2015, Pilgrim's issued a press release announcing its financial results

for the quarter ended June 30, 2015. The press release stated, in pertinent part:

### Pilgrim's Pride Reports Operating Income of $378 Million with a Margin of 18.4% for the Second Quarter of 2015, for a 26% Improvement Compared to 2014

GREELEY, Colo., July 29, 2015 (GLOBE NEWSWIRE) - Pilgrim's Pride Corporation (NASDAQ: PPC) reports second quarter 2015 financial results with Net Sales of $2.05 billion for the thirteen week period, as compared to $2.19

billion for the same period in 2014. The 2015 Q2 net income of $241.5 million was an improvement of 27% compared to the $190.4 million reported in the same period in 2014. Adjusted Earnings Per Share was $0.94 in the second quarter of 2015 compared to $0.73 in the same period last year, while adjusted Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") of $425.8 million, or a 20.7% margin, increased 26% compared to the $337.1 million generated in the prior year.

178.    In the July 30, 2015 press release, defendant Lovette stated:

We remain very committed to our goals of joint value creation with key customers, relentless pursuit of operational excellence and growing value added exports, and despite ongoing export challenges during Q2, our team has once again delivered solid results…

The vision and diversification strategy that we have implemented over the past few years are creating an opportunity for us to keep our strong performance in different market conditions and with lower volatility than any specific segment.

179.    Also on July 30, 2015, Pilgrim's filed its quarterly report on Form 10-Q with the SEC for the quarter ended June 30, 2015, which reiterated the information previously announced in the July 30, 2015 press release, stating, in pertinent part:

Market prices for feed ingredients remain volatile. ***Consequently, there can be no assurance that our feed ingredients prices will not increase materially and that such increases would not negatively impact our financial position, results of operations and cash flow.***

\*       \*       \*

***Market prices for chicken products are currently at levels sufficient to offset the costs of feed ingredients. However, there can be no assurance that chicken prices will not decrease due to such factors as competition from other proteins and substitutions by consumers of non-protein foods because of uncertainty surrounding the general economy and unemployment.***

(Emphasis added).

180.    The same day, defendants Lovette and Sandri held a conference call with investors to discuss Pilgrim's second quarter 2015 results (the "Second Quarter 2015 Earnings Call"), during which they spoke in detail about Pilgrim's margins, earnings, and net income.

During the call, defendants made false statements regarding both Pilgrim's performance and the chicken industry in general, as well as the factors that contributed to Pilgrim's performance. For example, defendant Lovette stated:

> As a reminder, *the industry is currently capacity-constrained by slaughter facilities since producers are already operating at a very high utilization rate, which limits the ability to process a large increase in supply of birds within the short term to medium term without significant investment in the whole value chain.* We're continuing to see solid demand from our customers particularly at quick-service restaurants. *And assuming current supply growth rates, we believe supply and demand to remain in balance*....Overall, we continue to see positive signs for demand and chicken continues to be the most attractive protein option available for retail and food service.

(Emphasis added).

181.    During the Second Quarter 2015 Earnings Call, defendant Lovette also stated:

> *It is a cyclical business.* We have a lot of factors beyond our control. Input cost, spot markets, high-path avian flu. And all of that combined makes it extremely difficult to tell you specifically what normalized margins could or should be in our industry. I would point out though that given what's happened the last two years to three years with competing meat prices with *our own industry showing discipline in matching supply and demand*, we believe that normalized margins, whatever they maybe, are structurally higher than they were 10 years ago or even seven years ago. And in addition to that, *whatever the average margin is for the industry, I believe, we've demonstrated the last few quarters that our business model close off better margins than the average company.* And we believe that spread should continue to grow in time as we get better with zero-based budgeting execution, as we get better with our management method. And also I'd point to the agility in our pricing strategy. We look to the future, we form a point of view about what we believe supply and demand will be in the next six months to 18 months and we change our pricing strategy commensurate with what we believe will happen and we've done that so far this year, and we believe that will continue to be constructive for us as well.

(Emphasis added).

182.    Inquiring about the strength and consistency of chicken prices as published on the Georgia Dock, an analyst for KeyBanc Capital Markets asked the following question of defendant Lovette during the Second Quarter 2015 Earnings Call:

[M]y second question is just in terms of pricing, so there's been some softness, as you alluded to earlier. But *Georgia Dock prices seem to have held up pretty well. So I'm just curious if you could talk a little bit about maybe what's driving that.* And then, in your view, do you see some risk to Georgia Dock prices as – with the potential of pork prices coming down further at retail? Thank you.

Defendant Lovette responded in part as follows:

> *So Georgia Dock market is reflective of whole birds. And you have a mix of small whole birds and medium sized whole birds in that mix. And we believe that it's the value of all those birds combined that it has been supported for keeping that price relatively high.* And we believe especially given the actual decline in the number head of small bird production this year over last and we don't see that's going to grow significantly in the future. *We believe that's Georgia Dock will continue to be supportive by the demand for that product.*

(Emphasis added).

183.    On October 29, 2015, Pilgrim's issued a press release announcing its financial results for the quarter ended September 30, 2015.  The press release stated, in pertinent part:

### Pilgrim's Pride Reports Operating Income of $231 Million with a Margin of 10.9% for the Third Quarter of 2015

GREELEY, Colo., October 28, 2015 (GLOBE NEWSWIRE) - Pilgrim's Pride Corporation (NASDAQ: PPC) reports third quarter 2015 financial results with Net Sales of $2.11 billion for the thirteen week period, compared to $2.27 billion for the same period in 2014. The 2015 Q3 Net Income was $137.1 million compared to the $256.0 million reported in the same period in 2014. Adjusted Earnings Per Share was $0.58 in the third quarter of 2015 compared to $1.01 in the same period last year, while adjusted Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") was $274.3 million, or a 13.0% margin.

184.    In the October 29, 2015 press release, defendant Lovette stated:

The Q3 results are a strong validation of our portfolio model, and the strategy we have pursued and implemented over the past four years is fundamental in improving our ability to maintain strong performance, minimize the impact of different market conditions, and give us more consistent financial results. Although we expect export markets to gradually reopen soon depending on the domestic AI situation, we choose not to stand still and be complacent. Instead, we continue to seek alternative and creative ways to reduce our dependencies on commodity products to produce more consistent margins by sharpening our focus

on high growth markets. We also remain on track to extract $200 million in operational improvements for the year.

In spite of the tough environment last quarter, our cash flow generation continues to be strong and our team remains relentless in uncovering additional methods to increase operational efficiencies, enhance relationships with key customers, and build competitive advantages. We remain committed to creating and maximizing shareholder value while retaining our financial discipline.

185.    Also on October 29, 2015, Pilgrim's filed its quarterly report on Form 10-Q with

the SEC for the quarter ended September 30, 2015, which reiterated the information previously

announced in the October 29, 2015 press release, stating, in pertinent part:

Market prices for feed ingredients remain volatile. *Consequently, there can be no assurance that our feed ingredients prices will not increase materially and that such increases would not negatively impact our financial position, results of operations and cash flow.*

\*       \*       \*

*Market prices for chicken products are currently at levels sufficient to offset the costs of feed ingredients. However, there can be no assurance that chicken prices will not decrease due to such factors as competition from other proteins and substitutions by consumers of non-protein foods because of uncertainty surrounding the general economy and unemployment.*

(Emphasis added).

186.    The same day, defendants Lovette and Sandri held a conference call with

investors to discuss Pilgrim's third quarter 2015 results (the "Third Quarter 2015 Earnings

Call"), during which they spoke in detail about Pilgrim's materially misleading margins,

earnings, and net income. During the call, defendants made false statements regarding both

Pilgrim's performance and the chicken industry in general, as well as the factors that contributed

to Pilgrim's performance. For example, defendant Lovette stated:

[I]n the face of the lowest cutout value seen over the last five years and ongoing challenges in major export markets coupled with a pricing environment comparable to 2011, *our operations continued to produce respectable margins last quarter. This is a validation of the benefit of our diverse portfolio model*

> *and all the operational improvements we've have achieved in the past four years,* giving us confidence that we are on the right track in implementing and executing our strategy. As we said many times before, our well-balanced portfolio and approach to bird sizes, customers, end markets and geographies reduces the impact of individual segments and gives us lower overall volatility and much more consistent performance over an extended period of time.
>
> *     *     *
>
> [T]he industry is showing discipline. As you mentioned earlier, pricing has receded and we're still focused on the fact that the *profitability of this industry depends on the supply and demand of chicken and really little from many other factors.*

(Emphasis added).

187.     Seeking an explanation for a dip in pricing, an analyst from BMO Capital Markets asked the following of defendants Lovette and Sandri during the Third Quarter 2015 Earnings Call:

> My second question is you said that the – just in terms of the pricing environment, you said that the supply is constrained, which we agree with you but you said the demand is strong. So which part is creating the weakness in the pricing? I'm just trying to figure – kind of figure out which side of it is both. The supply seems contained and you said the demand still seems robust. So – but yet the pricing has come in. So just trying to, again, figure out what exactly is causing the pricing. Is it just simply the export markets and if that cleans up, we would be off to the races?

Defendant Sandri responded as follows in pertinent part:

> When you look at the price environment on the big bird market compared by the cutout is what we are seeing. But *when we look at Urner Barry or when we look at Georgia Dock, which is more reflective of the small bird market, we can see that the market is still strong and demand and supply are more in balance.*

(Emphasis added).

188.     Responding to defendant Lovette's comments regarding the chicken industry being at or near full production capacity, a Barclays Capital analyst asked the following of defendant Lovette during the Third Quarter 2015 Earnings call:

And then, Bill, on your comments on the industry kind of being at full production capacity with no production coming over the next two years to three years, or it would take a while to get new plants up to make a difference. How do you view PPC's role in that? Is it something that you would think about to increase capacity? Or would you let others in the industry do it?

Defendant Lovette responded as follows:

We're focused on our key customers. ***If we see some of our key customers needing more product then we're going to do what's best for taking care of those customers and taking care of our business.***

(Emphasis added).

189.    On February 11, 2016, Pilgrim's issued a press release announcing its financial results for the quarter and year ended December 31, 2015.  The press release stated, in pertinent part:

### Pilgrim's Pride Closes Fiscal Year 2015 with an Operating Income of $1.04 Billion and a Margin of 12.8%, Confirming Benefits of Portfolio Strategy

GREELEY, Colo., February 10, 2016 (GLOBE NEWSWIRE) - Pilgrim's Pride Corporation (NASDAQ: PPC) today reported fiscal year 2015 financial results with Net Sales of $8.18 billion, Net Income of $645.9 million, and an Adjusted Earnings Per Share of $2.60. For fiscal year 2014, Net Sales was $8.58 billion, Net Income was $711.6 million, and Adjusted Earnings Per Share was $2.96, respectively. The company generated $1.21 billion of adjusted Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") in 2015, or a 14.9% margin, compared to $1.35 billion, or a 15.8% margin, in the year before, demonstrating a consistent solid year-on-year performance despite a much softer market environment.

For the fourth quarter of 2015, Pilgrim's recorded Net Sales of $1.96 billion, compared to $2.11 billion for the same period in 2014. Fourth quarter 2015 Net Income was $63.1 million compared to the $167.2 million reported in the prior year. Adjusted Earnings Per Share was $0.26 in the fourth quarter of 2015 compared to $0.83 in the same period last year, while adjusted EBITDA was $150.0 million last quarter, or a 7.7% margin, versus $367.8 million, or a 17.4% margin, for the same period a year ago.

190.    In the February 11, 2016 press release, defendant Lovette stated:

Our case ready and small bird operations continued to deliver strong results in spite of challenges in the export markets, while the weakest chicken cutout in the

past five years continued to impact the commodity segments of our business, as well as our Mexico operations. Despite the headwinds, our team managed to deliver margins that are above periods when prices were at similar levels. Our performance is commendable and strongly validates the benefits of our strategy…

The implementation and execution of our portfolio model over the past five years are critical in supporting our ability to deliver stronger profitability while giving more consistent financial results, as we minimize the impact of specific market conditions in any given segment or geography. For example, as part of this operating strategy, in Fresh Chicken we are able to leverage our well-balanced mix of bird sizes to support key customers' needs while in prepared foods, we could utilize our well-regarded Pierce brand to lead our efforts in building and solidifying relationships at key accounts.

*     *     *

Our cash flow generation was strong and our team remained relentless in identifying additional methods to increase operational efficiencies, enhance relationships with key customers, and build competitive advantages. To further support these initiatives and maximize return on capital, we have approved a targeted capital spending deployment for 2016, which enhances our growth prospects, improves our ability to partner with key customers and supports their growth. Additionally, our team has identified $185 million in operational improvements for 2016, to build on the over $1.0 billion in cumulative improvements we have made to the business in the last five years. We are committed to reinvesting our strong cash flow generation back into the business with the goal of more closely aligning with this strategy and optimizing our capital allocation, while remaining on track on the relentless pursuit of operational excellence.

191.   On February 12, 2016, Pilgrim's filed its annual report on Form 10-K with the

SEC for the quarter and year ended December 31, 2015 (the "2015 10-K").  The 2015 10-K

stated, in pertinent part:

> **Items that influence chicken pricing in the U.S. include international demand, changes in the production by other broiler producing countries, input costs and the our focus on sales mix enables us to adapt to changing supply-demand dynamics by adjusting our production to maximize value.**

*     *     *

We believe we are well positioned to be the primary chicken supplier for large customers due to our ability to provide consistent supply, innovate and develop new products to address consumer desires and provide competitive pricing across

a diverse product portfolio. *Our balanced portfolio of fresh, prepared and value-added chicken products yields a diversified sales mix, mitigating supply and market volatility and creating more consistent gross margins.*

\*     \*     \*

*In the U.S., prices of these products are negotiated daily or weekly and are generally related to market prices quoted by the USDA or other public price reporting services.*

\*     \*     \*

**Competition**

The chicken industry is highly competitive. We are one of the largest chicken producers in the world and we believe our relationship with JBS enhances our competitive position. In the U.S. and Mexico, we compete principally with other vertically integrated poultry companies. However, there is some competition with non-vertically integrated further processors in the U.S. prepared chicken business. We believe vertical integration generally provides significant, long-term cost and quality advantages over non-vertically integrated further processors.

In general, the competitive factors in the U.S. chicken industry include price, product quality, product development, brand identification, breadth of product line and customer service. Competitive factors vary by major market. In the U.S. retail market, we believe that product quality, brand awareness, customer service and price are the primary bases of competition. In the foodservice market, competition is based on consistent quality, product development, service and price. The export market is competitive on a global level based on price, product quality, product tailoring, brand identification and customer service. Competitive factors vary by market and may be impacted further by trade restrictions, sanitary and phyto- sanitary issues, brand awareness and the relative strength or weakness of the U.S. dollar against local currencies. We believe that product customization, service and price are the most critical competitive factors for export sales.

(Emphasis added).

192.   The 2015 10-K was signed by defendants Tomazoni, Lovette, Sandri, Bell, Cooper, Vasconcellos, Macaluso and Souza and contained signed certifications pursuant to SOX by defendants Lovette and Sandri, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

193.    The same day, defendants Lovette and Sandri held a conference call with investors to discuss Pilgrim's fourth quarter and full fiscal year 2015 results (the "Fiscal Year 2015 Earnings Call"), during which they spoke in detail about Pilgrim's margins, earnings, and net income. During the call, defendants made false statements regarding both Pilgrim's performance and the chicken industry in general, as well as the factors that contributed to Pilgrim's performance. For example, defendant Lovette stated:

> *We believe this performance is a validation of the effectiveness of our portfolio strategy. We do not expect to follow the full peaks and troughs of broader industry pricing trends; instead, the diversity of our product and customer mix means that we will benefit from strong markets, and at the same time be cushioned from some of the impacts of lower pricing giving us an overall volatility, lower volatility and higher margins.* Rather, our broad mix strategy gives us the potential to outperform others over an extended period of time. Despite what we have achieved so far we are not complacent as we believe there are still more work to be done.

> \*       \*       \*

> *The industry continues to be disciplined in terms of U.S. supply.* Although, monthly pullet data tend to be volatile and have occasionally been at the high end of our expectations, we see modest growth of the breeder flock, and more importantly, little to no increase in egg sits and chick placements as a positive. *We believe that at least part of the reason is because chicken producers are being disciplined and are much quicker to react than in the past and in adjusting supply growth to the actual market conditions.*

> \*       \*       \*

> *Therefore, assuming existing supply growth rates, we believe that this year's supply and demand to remain roughly in balance. Although cold storage inventories remain high compared to last year, we've already seen some reduction and expect greater stability in 2016, since it's due primarily to the export situation and not a general lack of demand.* Overall, we continue to see positive signs for demand and chicken continues to be the most attractive protein option available for retail and foodservice.

(Emphasis added).

194.    During the Fiscal year 2015 Earnings Call, an analyst from BMO Capital Markets

questioned defendant Lovette about Pilgrim's pricing strategy:

> Can you talk about your pricing strategy, because there is a competitor out there that is seemingly changing how they are doing their pricing and kind of moving more to a structural margin structure rather than ebbing and flowing with Urner Barry and Georgia Dock prices. Can you talk about if there is [sic] opportunities for that?

Defendant Lovette responded in part as follows:

> ***On the pricing front, we've not significantly changed our strategy from where it's been the last two years.*** I will tell you, we've added some more cost plus profit component not in a material way or significant way, but we have added to that;and we believe that's going to serve us well as we go into the future. And we never expected prices to remain as high as they were in 2014. ***We knew that at some point pricing would be weaker as we saw in 2015, and I believe our pricing strategy and operational strategy really served us well when you compare the margins that we generated in 2015 relative to the cutout in 2015 as compared to 2014. I think that validates, as we said, the balanced portfolio that we've created over the last five years.***

(Emphasis added).

195.    On March 25, 2016, the Company filed its proxy statement for 2016 with the SEC on Form DEF 14A (the "2016 Proxy").   The 2016 Proxy stated that the elements of compensation for the Company's executive officers consisted of, among other things, long term incentive compensation, based on the performance of the Company.   As such, defendants were awarded compensation based on the purported performance of the Company and its growing success based on the materially misleading statements and/or omissions concerning the price fixing scheme defendants engaged in.

196.    On April 28, 2016, Pilgrim's issued a press release announcing its financial results for the quarter ended March 31, 2016.  The press release stated, in pertinent part:

**Pilgrim's Pride Reports Operating Income of $189 Million with a Margin of 9.6% for the First Quarter of 2016**

GREELEY, Colo., April 27, 2016 (GLOBE NEWSWIRE) - Pilgrim's Pride Corporation (NASDAQ: PPC) reports first quarter 2016 financial results.

**First Quarter Highlights**
- Net sales of $1.96 billion.
- Net Income of $118.4 million, GAAP EPS of $0.46.
- EBIT margins of 10.5% in U.S. and 4.8% in Mexico operations, respectively.
- Adjusted EBITDA of $233.5 million (or an 11.9% margin).
- Free Cash Flow of $141.3 million.
- Conversion of a production facility to USDA-certified organic chicken, enhancing PPC leadership in emerging consumer trends and leveraging partnerships with key customers to support their growth.

197.    In the April 28, 2016 press release, defendant Lovette stated:

While market conditions contributed to the improvement, our well-balanced portfolio played a key factor in delivering the improved Q1 performance since we were able to leverage the strength in specific market segments while minimizing the impact of the others…

We continue to believe our portfolio strategy, combined with our approach of being a valued partner with key customers and pursuing operational excellence while strategically growing value-added exports, will allow us to deliver less volatility and higher earnings to our shareholders over time.

198.    Also on April 28, 2016, Pilgrim's filed its quarterly report on Form 10-Q with the

SEC for the quarter ended March 31, 2016, which reiterated the information previously

announced in the April 28, 2016 press release, stating, in pertinent part:

Market prices for feed ingredients remain volatile. Consequently, ***there can be no assurance that our feed ingredients prices will not increase materially and that such increases would not negatively impact our financial position, results of operations and cash flow.***

\*       \*       \*

***Market prices for chicken products are currently at levels sufficient to offset the costs of feed ingredients. However, there can be no assurance that chicken prices will not decrease due to such factors as competition from other proteins and substitutions by consumers of non-protein foods because of uncertainty surrounding the general economy and unemployment.***

(Emphasis added).

199.    The same day, defendants Lovette and Sandri held a conference call with

investors to discuss Pilgrim's first quarter 2016 results (the "First Quarter 2016 Earnings Call"),

during which they spoke in detail about Pilgrim's margins, earnings, and net income. During the

call, defendants made false statements regarding both Pilgrim's performance and the chicken

industry in general, as well as the factors that contributed to Pilgrim's performance. For example,

defendant Lovette stated:

> *U.S. industry players have remained disciplined in terms of adding new supplies as* evidenced by the significant growth in the greater block so far this year and while egg set and chick placements data on top of that are flat to up slightly year-to-date are *reflected of the balanced supply-demand scenario. We believe chicken producers are much quicker to react then in the past in adjusting supply growth to actual market conditions* have seen in the larger and seasonal production cuts late last year while being much more deliberate in adding new capacities than before, all positives for the industry.

(Emphasis added).

200.    Also on the First Quarter 2016 Earnings Call, defendant Sandri stated:

> *On leg quarters, during last quarter, the US industry diversified their exports as mentioned due to the trade barriers and challenges on international economies and that's helped maintain the inventories at very low levels.*

(Emphasis added).

201.    On July 28, 2016, Pilgrim's issued a press release announcing its financial results

for the quarter ended June 30, 2016.  The press release stated, in pertinent part:

### Pilgrim's Pride Reports Operating Income of $237 Million with an Operating Margin of 11.7% for the Second Quarter of 2016

GREELEY, Colo., July 27, 2016 (GLOBE NEWSWIRE) - Pilgrim's Pride Corporation (NASDAQ: PPC) reports second quarter 2016 financial results.

#### Second Quarter Highlights
- Net Sales of $2.03 billion.
- Net Income of $152.9 million, GAAP EPS of $0.60.
- Operating Income margins of 9.8% in U.S. and 205.% in Mexico operations, respectively.
- Adjusted EBITDA of $282.7 million (or a 13.9% margin).
- Cash Flow from Operations of $111.1 million.

- Prepared Foods to launch new ABF veg-fed chicken sausage products, leveraging our leadership in ABF veg-fed Fresh Chicken and entry into organic.
- Operational improvements in Prepared Foods operations impacting production in short-term but preparing facilities for long-term growth.

202.    In the July 28, 2016 press release, defendant Lovette stated:

During Q2, our results further improved sequentially compared to the last two quarters. While our portfolio strategy of a well-balanced exposure to different bird sizes was an important factor, the diversity of our product and broad customer mix, as well as geographic exposure were also important contributors. We structured our portfolio to capture the strong commodity markets while lessening the impact of weaker markets to generate lower volatility and higher margins over the mid to long-term. We are generating the intended results and created a unique and meaningful advantage over competitors with less breadth in their portfolio.

203.    Also on July 28, 2016, Pilgrim's filed its quarterly report on Form 10-Q with the

SEC for the quarter ended June 30, 2016, which reiterated the information previously announced

in the July 28, 2016 press release, stating, in pertinent part:

Market prices for feed ingredients remain volatile. Consequently, *there can be no assurance that our feed ingredients prices will not increase materially and that such increases would not negatively impact our financial position, results of operations and cash flow.*

\*        \*        \*

*Market prices for chicken products are currently at levels sufficient to offset the costs of feed ingredients. However, there can be no assurance that chicken prices will not decrease due to such factors as competition from other proteins and substitutions by consumers of non-protein foods because of uncertainty surrounding the general economy and unemployment.*

\*        \*        \*

U.S. net sales generated in the thirteen weeks ended June 26, 2016 decreased $161.4 million, or 8.8%, from U.S. net sales generated in the thirteen weeks ended June 28, 2015 primarily because of decreased sales volume. The decrease in sales volume contributed $101.3 million, or 5.5 percentage points, to the net sales decrease. *The decrease in sales volume was partially due to production limitations caused by operational improvements in one of our prepared foods facilities during the period.* Lower net sales per pound, which reflects a slight shift in product mix toward lower-priced fresh chicken products when compared

to the same period in the prior year, contributed $60.2 million, or 3.2 percentage points, to the net sales decrease.

\*        \*        \*

U.S. net sales generated in the twenty-six weeks ended June 26, 2016 decreased $333.9 million, or 9.1% , from U.S. net sales generated in the twenty-six weeks ended June 28, 2015 primarily because of decrease in sales volume and a decrease net sales per pound. The decrease in sales volume contributed $170.3 million, or 4.6 percentage points, to the decrease in net sales. ***The decrease in sales volume was partially due to production limitations caused by operational improvements in one of our prepared foods facilities during the period.*** Lower net sales per pound, which reflects a slight shift in product mix toward lower-priced fresh chicken products when compared to the same period in the prior year, contributed $163.6 million, or 4.4 percentage points, to the net sales decrease.

(Emphasis added).

204.   The same day, defendants Lovette and Sandri held a conference call with investors to discuss Pilgrim's second quarter 2016 results (the "Second Quarter 2016 Earnings Call"), during which they spoke in detail about Pilgrim's materially misleading margins, earnings, and net income. During the call, defendants made false statements regarding both Pilgrim's performance and the chicken industry in general, as well as the factors that contributed to Pilgrim's performance. For example, defendant Lovette stated:

> ***Producers have been very deliberate about adding new supplies compared to the past as indicated by the marginal growth in the breeder flock so far this year while egg sets and chick placements data are flat to up slightly year-to-date are reflecting a balanced supply-demand environment.***

(Emphasis added).

205.   On October 26, 2016, Pilgrim's issued a press release entitled "Pilgrim's Pride Reports Operating Income of $164 Million with an Operating Margin of 8.1% for the Third Quarter of 2016" ("Third Quarter 2016 Press Release"). The next day, the Company filed a Form 8-K ("Third Quarter 2016 Form 8-K") with the SEC, which defendant Sandri signed, that included the press release as an exhibit, reporting third quarter 2016 financial results, including

EBITDA of $210.8 million, net income of $98.7 million, and earnings of $0.39 per share for the quarter. Defendant Lovette stated that "[d]uring Q3, our Fresh business continued to perform well driven by our differentiated portfolio strategy of having presence in all three bird sizes and strong relationships with key customers. Retail demand for our birds remained robust despite concerns about greater availability of other competing proteins."

206.    The same day, on October 27, 2016, Pilgrim's filed its Form 10-Q for the quarterly period ended September 25, 2016 ("Third Quarter 2016 Form 10-Q"), signed by defendants Lovette and Sandri, with the SEC. The Third Quarter 2016 Form 10-Q repeated the financial results and margins reported in the Company's Third Quarter 2016 Form 8-K.

207.    The Third Quarter 2016 Form 10-Q also stated:

Market prices for feed ingredients remain volatile. Consequently, ***there can be no assurance that our feed ingredients prices will not increase materially and that such increases would not negatively impact our financial position, results of operations and cash flow.***

\*          \*          \*

***Market prices for chicken products are currently at levels sufficient to offset the costs of feed ingredients. However, there can be no assurance that chicken prices will not decrease due to such factors as competition from other proteins and substitutions by consumers of non-protein foods because of uncertainty surrounding the general economy and unemployment.***

\*          \*          \*

U.S. net sales generated in the thirteen weeks ended September 25, 2016 decreased $73.8 million, or 4.1%, from U.S. net sales generated in the thirteen weeks ended September 27, 2015 primarily because of decreased sales volume. ***The decrease in sales volume, which resulted from the unfavorable impact that ongoing operational improvements in one of our prepared foods facilities had on production during the period*** and lower product demand from our commercial customers, contributed $94.3 million, or 5.2 percentage points, to the net sales decrease.

\*          \*          \*

U.S. net sales generated in the thirty-nine weeks ended September 25, 2016 decreased $407.6 million, or 7.4% , from U.S. net sales generated in the thirty-nine weeks ended September 27, 2015 primarily because of a decrease in sales volume and a decrease in net sales per pound. ***The decrease in sales volume, which resulted from the unfavorable impact that ongoing operational improvements in one of our prepared foods facilities had on production during the period and lower product demand from our commercial customers, contributed $264.***9 million, or 4.8 percentage points, to the decrease in U.S. net sales.

(Emphasis added).

208.   The statements described above were materially misleading and/or omitted material information about the Company's business, operational and compliance policies, including that: (i) Pilgrim's systematically colluded with several of its industry peers to fix prices in the broiler-chicken market; (ii) the foregoing conduct constituted a violation of federal antitrust laws; (iii) consequently, the Company's revenues during the Relevant Period were the result of illegal conduct; and (iv) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

209.   The above statements made by defendant Lovette were made with the knowledge of and pursuant to the instructions of his superiors.  As set forth in the below included Company press release, defendant Lovette reports directly to the CEO of JBS USA, who, in turn, reports directly to the Batistas:

### PILGRIM'S PRIDE APPOINTS WILLIAM W. LOVETTE
### AS PRESIDENT AND CHIEF EXECUTIVE OFFICER

**Pilgrim's CEO Don Jackson to Become President and CEO of JBS USA, Majority Owner of Pilgrim's**

GREELEY, CO, December 16, 2010 – Pilgrim's Pride Corporation (NYSE: PPC) today announced that its board of directors has appointed William W. Lovette as president and chief executive officer of the company, effective January 3, 2011. Mr. Lovette succeeds Don Jackson, who is resigning from the company effective January 2, 2011, in order to assume the position of president and chief executive officer of JBS USA, which is majority owner of Pilgrim's. **Mr. Lovette will**

**report directly to Mr. Jackson, who will continue to serve on Pilgrim's board of directors. In his new role, Mr. Jackson will continue reporting to Wesley M. Batista, who will remain as chairman of Pilgrim's and JBS USA Holdings, Inc.**

Mr. Lovette, 50, brings more than 27 years of industry leadership experience to Pilgrim's. Since 2008, he has served as president and COO of Case Foods, Inc. Before joining Case, Mr. Lovette spent 25 years with Tyson Foods in various roles in senior management, including President of its International Business Unit, President of its Foodservice Business Unit and Sr. Group Vice President of Poultry and Prepared Foods. While at Tyson Foods, he served on the boards of Tyson de Mexico, CobbVantress, Inc. and EFS Network, Inc.

"Bill is exceptionally qualified to lead Pilgrim's and our 41,000 employees to even greater success in the years ahead," said Mr. Jackson. "He brings a tremendous breadth of industry experience and a proven track record of success to this role. He has a deep knowledge of the poultry business and the market environment, and we believe that he will lead Pilgrim's to continued growth and profitability."

(Emphasis added).

## The Truth is Revealed

210.    On September 2, 2016, the *Maplevale* Action was filed in the U.S. District Court

for the Northern District of Illinois against Pilgrim's Pride and several other poultry producers,

including Tyson, alleging that Pilgrim's and the other companies named in the complaint had

conspired since 2008 to manipulate the prices of broiler chickens in violation of the Sherman

Act.

211.    Specifically, the complaint in the *Maplevale* Action alleged:

The principal (but not exclusive) method by which Defendants implemented and executed their conspiracy was by coordinating their output and limiting production with the intent and expected result of increasing prices of Broilers in the United States. In furtherance of their conspiracy, Defendants exchanged detailed, competitively sensitive, and closely-guarded non-public information about prices, capacity, sales volume, and demand…[19]

---

[19] *Maplevale Farms, Inc. v. Koch Foods, Inc. et al.*, Case No. 1:16-cv-8637 (N.D. Ill.) (Complaint), at ¶ 1 (the "*Maplevale* Complaint").

Defendants continued to limit the United States Broiler supply . . . by destroying eggs, relying upon one another's production to meet customer needs, and exporting excess Broiler breeder flocks to Mexico, even when doing so was against their independent economic interest.

*Maplevale* Complaint, ¶ 6.

The consequence of Defendants' cuts…have [sic] been a nearly 50% increase in Broiler wholesale prices since 2008, despite input costs (primarily corn and soybeans) *falling* roughly 20% to 23% over the same time period. The rise in Broiler prices relative to input costs has led to record profits for Defendants.

*Maplevale* Complaint, ¶ 7.

212.    On September 13, 2016, Bloomberg published an article concerning the purported price fixing scheme entitled "Why America Pays 50% More for Chicken,"[20] which stated:

**The $29 billion poultry industry has been accused of hatching a plan to limit production.**

The $29 billion industry that churns out 90 percent of America's chickens has engaged in a price-fixing scheme for years, according to the first of a half-dozen lawsuits filed in Chicago federal court this month. And that artificial premium has been passed on to consumers: You've been paying 50 percent more for that supermarket rotisserie bird, the lawsuits claim. While producers have been accused of rigging the market before, this litigation may be the largest effort yet to bring such practices to light.

For decades, the price of a broiler—the standard, non-organic, non-halal, non-kosher chicken that makes up 98 percent of what's sold—followed a boom and bust pattern: Rising demand led to higher prices and more production, then to oversupply and a drop in prices. In 2008 that began to change. The reason, according to the 113-page lawsuit, is that the producers launched a coordinated strategy, one facilitated by shared proprietary information and countless industry events involving top executives. All of the companies raised fewer chickens, holding down supply and driving up the price of the country's most popular meat.

*         *         *

The court complaint traces the alleged collusion back to 2008, when—thanks to high feed prices, debt, and an oversupplied chicken market—Pilgrim's Pride, one of the country's largest poultry companies, was facing serious financial difficulties. It brought in consultants from Bain & Co. to help find a solution, the

---

[20] Deena Shanker, *Why America Pays 50% More for Chicken*, Bloomberg (Sept. 28, 2016), *available at* https://www.bloomberg.com/news/articles/2016-09-28/is-there-a-vast-conspiracy-to-overcharge-you-for-chicken.

lawyers contend. This wasn't enough: In December, Pilgrim's filed for bankruptcy and eventually became part of meat conglomerate JBS USA Holdings, a unit of São Paulo-based JBS S.A. But those consultants did, according to the complaint, offer some sage advice: Pilgrim's Pride needed to cut supply so prices would rise. (Bain didn't respond to requests for comment.)

There was a catch, though. Chickens are a commodity: Tyson's chicken is indistinguishable from Pilgrim's, which is indistinguishable from that of other defendants, such as Perdue Farms Inc., so this plan would work only if the whole industry participated.

213.   Between September 7, 2016 and October 21, 2016, several similar class action complaints as that in the *Maplevale* Action were filed against Pilgrim's and other poultry companies in the Northern District of Illinois, on behalf of individual consumers and indirect purchasers of broiler chickens, all alleging that Pilgrim's and its industry peers had engaged in the price-manipulation scheme described in the *Maplevale* Complaint.

214.   On October 7, 2016, Pivotal downgraded Tyson from "Hold" to "Sell." Explaining the downgrade, analyst Timothy Ramey directed investors' attention to the allegations of price manipulation by Pilgrim's, Tyson, and their industry peers and described the *Maplevale* Complaint as "powerfully convincing." Ramey drew attention to the fact that industry analysts "have long wondered how an industry marked by such volatility and lack of discipline, could morph to a highly disciplined industry where production remains constrained and pricing remains high." But after review of the antitrust allegations, Ramey stated that "the evidence is quite chilling. There is no easy way to explain the perfect harmony that the industry has operated in since 2009…."

215.   More specifically, Ramey's report explained that feed prices had decreased considerably between 2014 and 2016—a condition that historically would "encourage producers to add capacity to Broilers and would sow the seeds of a cyclical margin collapse"—but

thosedictable market reactions did not occur during the Relevant Period, which he attributed to "the invisible hand of Agri Stats."

216.    On news that Pivotal had downgraded Tyson on the strength of the price-manipulation allegations against Tyson, Pilgrim's, and the other companies named in the *Maplevale* Complaint, the Company's share price fell $0.95, or 4.5%, to close at $20.16 on October 7, 2016.

217.    While the *Maplevale* complaint and the Pivotal Research Report brought to light previously undisclosed facts regarding certain collusive behavior by Pilgrim's and other industry participants, the manipulation of the Georgia Dock index was unknown to the market until November 2016 through the publication of two articles: one by *The New York Times*, and the other by *The Washington Post*.

218.    *The New York Times* published the first of the two articles entitled, "You Might Be Paying Too Much for Your Chicken" on November 3, 2016. Written by Stephanie Strom, the article reported for the first time, based on documents that *The New York Times* received pursuant to a Freedom of Information Act request, that the USDA initiated an inquiry into the Georgia Dock index, questioning the accuracy of unverified data that Pilgrim's and other chicken producers provided to the GDA for compilation of the index. Citing emails obtained through the FOIA request, the article indicated that the GDA "is in agreement with the poultry industry that there is no desire to review invoices for verification of data reported." The article pointed to the price discrepancy between the Georgia Dock and the Urner Barry index and also noted that the price of beef and pork had recently fallen due to lower corn and soybean prices, "[b]ut chicken? Steady as she goes."

219.   Following publication of *The New York Times* article, Pilgrim's stock dropped from $21.02 at close on November 3, 2016, to $19.31 at close on November 4, 2016, a decline of over 8% on exceptionally high trading volume.

220.   The second article, "If You Thought You Were Paying Fair Prices for Chicken at the Supermarket, Think Again," published by *The Washington Post* on November 17, 2016, revealed further information about the relevance of Georgia Dock manipulation to the Broiler industry, and provided further color from GDA director Arty Schronce. First, the article explained the potential price impact for consumers, noting that "[o]ver the past two years, the … Georgia Dock [] has drifted significantly upward from other chicken price averages, rising about 20 percent or more out of line with a separate but lesser known index maintained by the USDA. A deviation in supermarket chicken prices of that magnitude would have cost U.S. grocery shoppers billions of dollars in recent years." The Georgia Dock was so influential, according to the article, "because so many grocery chains use it in their contracts with chicken companies" and "some very large players have acknowledged that the Georgia Dock is the basis of, or a factor in, the price they pay for chicken."

221.   The article also provided a link to an internal memorandum prepared and circulated by Mr. Schronce that explained that he "continue[d] to have concerns about" the Georgia Dock, had "voiced concerns in the past," and that he thought the Georgia Dock was a "flawed product that is a liability to the Georgia Department of Agriculture." More specifically, Mr. Schronce wrote that "I have come to question the validity of the information provided" to the GDA from poultry producers, and that they would give him "lackadaisical and rude responses to my requests for information," such as responding "just keep em' the same" when he would ask for a company's updated broiler price.

222.     Furthermore, the Schronce Memo brought attention to the Advisory Board, made up largely of executives from Broiler producing companies, writing, "I have questions about the 'Advisory Board' and its role over an office of a state regulatory agency that is supposed to be independent. I was told I could not make any changes without clearing them with the Advisory Board."

223.     In response to these revelations, Pilgrim's stock again fell, dropping from $19.64 at close on November 16, 2016 to $18.61 at close on November 17, 2016, and continued to slide for the next several trading days on high trading volume as the market absorbed the information.

224.     On November 20, 2017, the *Maplevale* Action court denied a motion to dismiss filed by the Company stating that: "There is simply too much unusual market movement, unusual public statements, unusual information sharing through Agri Stats, and a coincidence of business strategies that make dismissal of Plaintiffs' claims at this point in the case inappropriate."

225.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, the Company has been and continues to be harmed and suffers and will suffer significant losses and damages.

## DAMAGES TO THE COMPANY

226.     Pilgrim's has been, and will continue to be, severely damaged and injured by the director defendants' misconduct.  As a direct and proximate result of the defendants' conduct, Pilgrim's has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

        a.   costs incurred in compensation and benefits paid to defendants that violated federal securities laws;

b.   costs incurred defending against SEC, DOJ and other government investigations and litigation;

c.   substantial loss of market capital;

d.   costs already incurred and to be incurred defending the pending securities fraud class action captioned *Patrick Hogan v. Pilgrim's Pride Corporation, et al.*, 1:16-cv-02611-RBJ (D. Colo.) (the "Securities Class Action");

e.   costs already incurred and to be incurred defending the pending Antitrust Class Actions; and

f.   any fines or other liability resulting from the Company's violations of federal law.

227.   In addition, the Company's business, goodwill and reputation with its business partners, regulators and shareholders have been gravely impaired.  The credibility and motives of management are now in serious doubt.

228.   The wrongdoing complained of herein has irreparably damaged the Company's corporate image and goodwill.  For at least the foreseeable future, Pilgrim's will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that the Company's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

229.   Plaintiff brings this action derivatively in the right and for the benefit of Pilgrim's to redress injuries suffered, and to be suffered, by Pilgrim's as a direct result of violations of federal securities laws by the director defendants.  Pilgrim's is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court

that it would not otherwise have.

230.    The Board of Pilgrim's, at the time this action was commenced, consisted of the following nine individuals: defendants Souza, Molina, Farahat, Tomazoni, Lovette, Vasconcellos, Bell, Cooper, and Macaluso.  As such, Plaintiff must only allege that half of the Board is not independent for demand futility purposes.  Since the Company's Board consists of nine individuals at the time this action was commenced, Plaintiff must allege demand futility as to only five of the Board's directors.

### Demand is Futile Because Defendants Face a Substantial Likelihood of Liability

231.    Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Pilgrim's Board would be futile, and therefore, excused.  This is because a majority of the Board faces a substantial likelihood of liability as a result of their scheme and false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein, and breach of fiduciary duties by knowingly tolerating the price-fixing scheme herein described.

232.    By participating in this course of conduct, the director defendants exposed the Company to damage and injury. Consequently, the director defendants face a substantial risk of liability for causing the Company to issue the false and misleading statements and/or omitting the material information concerning the scheme to fix the prices of broiler chickens, rendering them unable to fairly and objectively evaluate a pre-suit demand. Thus, demand on the Board is futile, and therefore excused.

### Demand is Futile as to the Employee-Directors, Who Comprise a Majority of the Board

233.    Defendant Lovette has been the CEO and President of the Company since January 3, 2011 and a member of the Board since February 21, 2011.  In his role as CEO and President

of Pilgrim's for the fiscal years ended 2016, 2015 and 2014, defendant Lovette received $2,975,725, $6,553,337, and $9,286,078 in total compensation, respectively.  The Company does not claim that defendant Lovette is an independent director and because defendant Lovette derives significant income from, and his primary source of income is, his employment as CEO and President of Pilgrim's and his professional reputation is inextricably bound to his role at Pilgrim's, defendant Lovette is incapable of acting independently and demand is futile upon him.

234.    The Company's Proxy admits that the JBS appointed directors are employee directors, as follows:

> Gilberto Tomazoni, Joesley Mendonça Batista, Wesley Mendonça Batista, Andre Nogueira de Souza and William W. Lovette did not receive any compensation solely for service as Directors" [because], "Under the Company's current compensation program for Directors (the "Program"), ***directors who are employed by the Company or any of its subsidiaries will not receive any additional compensation for their services as directors***.  The Program provides that each non-employee Director will receive an annual retainer of $140,000, paid quarterly in arrears, composed of $70,000 in cash with the remainder consisting of either cash or a combination of cash and equity awards to be determined by the Board."

Form DEF 14A, at 35, filed with the SEC on March 31, 2017. (Emphasis added).

235.    Defendants Tomazoni, Farahat, Molina and Souza are employees and/or directors of JBS, as indicated by their not receiving director fees for directorships on Pilgrim's Board. Defendant Tomazoni has been the president of the Global Poultry Division of JBS since 2013. Defendant Farahat was the Chairman of the Board of Directors of JBS from 2013-2017 and the Global President of Marketing and Innovation of JBS.  Defendant Molina is the CFO of JBS USA Food Company, a subsidiary of JBS.  Defendant Souza has been the President and CEO of JBS USA Holdings since January 1, 2013 and began his career with JBS USA Holdings in 2007.

236.    Because defendants Tomazoni, Farahat, Molina, and Souza, are employees of the companies controlled by or controlling Pilgrim's Pride, the Company does not claim that

defendants Tomazoni, Farahat, Molina, or Souza are independent directors and because they each derive significant income from, and their primary source of income is, their employment at companies controlled by or controlling Pilgrim's, and their professional reputations are inextricably bound to their roles in these companies, defendants Tomazoni, Farahat, Molina, and Souza, are incapable of acting independently and demand is futile upon them.

### Demand is Futile Because a Majority of the Board Have Demonstrated a Primary Loyalty to the Batistas and JBS, Rather than to the Company and its Shareholders

237.    Demand is futile as to defendants Tomazoni, Farahat, Molina, Vasconcellos, Souza, and, Lovette, because they are beholden to JBS.

238.    Pursuant to the Company's Certificate of Incorporation and the Company's bylaws, six of the Board's nine directors, including the Chairman of the Board, are designated by the JBS Nominating Committee.  The JBS Nominating Committee consists only of JBS Directors and has the exclusive authority to nominate the JBS Directors.  As of the present date, the JBS Directors include defendants Tomazoni, Farahat, Molina, Souza, Vasconcellos, and, Lovette.

239.    The JBS Directors comprising a majority of the Board have demonstrated their primary loyalty to the Batistas and JBS rather than to the Company and its shareholders, as detailed below.

240.    In mid-March, 2017, at the time the Batistas and JBS entered into their second plea deal with the Brazilian authorities, including the Batistas' admission of a massive pattern and practice of criminal activity on behalf of JBS, the Company's JBS Nominating Committee included, besides the Batista brothers, defendants (1) Tomazoni (President of the Global Poultry Division of JBS since 2013), (2) Souza (Since January 1, 2013, Chief Executive Officer and President of JBS USA Holdings, which holds the U.S., Canadian and Australian operations of

JBS, and from 2007 through 2011 Chief Financial Officer of JBS USA Holdings, and in 2012, Chief Executive Officer of JBS Australia, a subsidiary of JBS), (3) Vasconcellos, and, (4) Lovette.

241.    There exists a reasonable inference that the four members of the JBS Nominating Committee were aware of the indictment of the Batistas, five other JBS executives, and JBS, as well as the mid-March JBS negotiated cooperation agreement with the Brazilian government on the corruption charges relating to JBS, in which JBS and the Batista brothers had admitted to an over decade long pattern and practice of bribery on behalf of JBS involving over 1,800 different bribes to politicians and Brazilian government department employees, including food safety inspectors.  It is also a reasonable to infer that the members of the JBS Nominating Committee were aware that a Brazilian federal judge barred defendants Wesley and Joesley Batista from serving as executive officers and chairman of JBS in September 2016, until bond was posted.

242.    Despite the JBS Nominating Committee's knowledge of the admitted massive criminality to which the Batista brothers had admitted in mid-March 2017 – crimes so massive in their scope that the publication of the Batista brothers' admissions led to Brazil's worst financial market selloff in at least a decade, a nearly 10% devaluation of the Brazilian real, and massive street demonstrations – in the Company Proxy filed on March 31, 2017, the JBS Nominating Committee obediently appointed defendants Wesley and Joesley Batista to positions as Company directors.

243.    The Nominating Committee did not inform shareholders in the Proxy that defendants Wesley and Joesley Batista had, in the weeks prior to their appointment as directors by the JBS Nominating Committee, admitted to an over decade long pattern and practice of massive criminal conduct.  Instead, the Nominating Committee falsely informed shareholders

that,

> ***"[Wesley] Batista has long been one of the most respected executives in Brazil's
> protein industry, and his reputation is now firmly established worldwide*.***"

(Emphasis added).

In fact, with the public revelation of JBS and the Batistas' over decade long massive

criminal enterprise, Wesley Batista was, at the time of the proxy, was one of the most disgraced

and disrespected men in the nation of Brazil.

244.    By having appointed the Batista brothers as Company directors despite their

admitted longstanding history of criminal conduct through JBS, resulting in the second largest

criminal fine in history, and by lying to shareholders to protect the Batistas, the JBS Nominating

Committee members have demonstrated themselves to be controlled by and/or beholding to, the

Batista family.

245.    Though defendant Farahat was appointed to the Board after the issuance of the

Proxy, defendant Farahat has demonstrated his primary allegiance to the Batistas and JBS over

the interests of the Company and its shareholders.  defendant Farahat acquiesced to: (1) W.

Batista remaining a director even after J. Batista resigned, and, (2) the failure of the Company to

issue a corrective filing correcting the Board's misstatements about the Batistas and JBS and

failure to disclose the massive criminal activity for which they had been indicted, entered a plea

deal, and fully admitted.

246.    Due to their demonstrated primary loyalty to the Batistas and JBS, at the expense

of the interests of the Company and its shareholders, the members of the JBS Nominating

Committee, including defendant Farahat, are incapable of making an impartial decision as to

whether or not to institute an action against the Batista brothers and JBS for their illegal price-

fixing and violations of law on behalf of the Company.

**Demand is Futile as to the Members of the Audit Committee**

247.    Pursuant to the Company's Audit Committee Charter,[21] defendants Cooper, Macaluso and Vasconcellos (the "Audit Committee Defendants"), as members of the Audit Committee of Pilgrim's, were responsible for the oversight of the accounting, financial reporting processes, and financial statements of the Company.  Moreover, it was the policy and practice of the Audit Committee Defendants to review SEC filings and press releases prior to their issuance. As a result, the Audit Committee Defendants either knew that the Company failed to disclose the material information described herein concerning the price fixing scheme of broiler-chickens or should have known.  However, the Audit Committee Defendants caused the Company to violate federal securities law by allowing the materially misleading disclosures and omissions described herein.  As a result, demand is excused as to defendants Cooper, Macaluso and Vasconcellos.

**Demand is Futile as to the Members of the Compensation Committee**

248.    Defendants Cooper and Vasconcellos (the "Compensation Committee Defendants"), as members of the Compensation Committee of Pilgrim's, were responsible for reviewing and making decisions regarding executive compensation programs.  Further, the Compensation Committee directly oversees risk management relating to employee compensation, including any risks of compensation programs encouraging excessive risk-taking. The Compensation Committee has the overall responsibility for approving executive compensation and overseeing the administration of the Company's incentive plans and employee benefit plans.

249.    Accordingly, the Compensation Committee applies the following guiding

---

[21] *See* Audit Committee Charter (Amended and Restated as of December 28, 2009), *available at* http://ir.Pilgrims.com/corporate-governance-document.cfm?DocumentID=12163 (the "Audit Committee Charter").

principles and policies in rendering their compensation decisions, including:

- Incentive compensation should represent a significant portion of total compensation;

- Compensation should be performance-based;

- Incentive compensation should balance short-term and long-term performance;

- Compensation levels should be market competitive; and

- Superior performance should be rewarded.

2016 Proxy, at 16.

250.    The Compensation Committee Defendants presided over an utter failure of corporate governance by permitting the Company to suffer from a widespread and pervasive deficiency of internal controls for years, and approving executive officers' and directors' continued and excessive compensation.   In so doing, any demand upon the Compensation Committee Defendants is futile, and therefore excused.

## COUNT I

### Against Defendants for Violations of Section 14(a) of the
### Securities Exchange Act of 1934 and Rule 14a-9 Promulgated Thereunder

251.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

252.    Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.   Specifically, the Company's 2014, 2015, 2016, and 2017 Proxy Statements violated §14(a) and Rule 14a-9 because they omitted material

information regarding the wrongdoing of defendants, and included by reference materially false and misleading financial statements.

253.    In particular, the Company's 2017 Proxy Statement omitted material information regarding the crimes for which the Batistas and JBS were under indictment, were negotiating plea bargains admitting the crimes, and were under investigation for operating a vast criminal enterprise through JBS and instead in the Company Proxy filed on March 31, 2017, the JBS Nominating Committee falsely informed shareholders that, "[Wesley] Batista has long been one of the most respected executives in Brazil's protein industry, and his reputation is now firmly established worldwide."   In fact, with the public revelation of JBS and the Batistas' massive criminal enterprise, Wesley Batista was, at the time of the proxy, an indicted felon who had confessed massive crimes as part of a leniency deal; W. Batista's was in fact, disrespected and disgraced.

254.    This information would have been material to shareholders in making their decision when voting on Proposal 1 of the 2017 Proxy statement deciding whether to elect the Batistas to remain in a position on the Company's Board.[22]

255.    In the exercise of reasonable care, defendants should have known that the 2014, 2015, 2016, and 2017 Proxy Statements contained misleading information and/or omitted material information.

256.    The misrepresentations and omissions in the 2014, 2015, 2016, and 2017 Proxy Statements were material to Company shareholders in voting on the 2014-2017 proxy statements.

257.    The Company was damaged as a result of the defendants' material

---

[22] Form DEF 14A, at 8-9, filed with the SEC on March 31, 2017.

misrepresentations and omissions in the 2014, 2015, 2016, and 2017 Proxy Statements.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duties

258. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

259. The individual defendants owed and owe the Company fiduciary obligations. By reason of their fiduciary relationships, the individual defendants owed and owe the Company the highest obligation of good faith, loyalty, and due care.

260. The individual defendants have violated and breached their fiduciary duties of good faith, loyalty, and due care by causing or allowing the Company to disseminate false and misleading information to the public through press releases and various filing with the SEC. In particular, the individual defendants caused to company to issue materially misleading and/or omitted material information about the Company's business, operational and compliance policies, including that: (i) Pilgrim's systematically colluded with several of its industry peers to fix prices in the broiler-chicken market; (ii) the foregoing conduct constituted a violation of federal antitrust laws; (iii) consequently, the Company's revenues during the Relevant Period were the result of illegal conduct; and (iv) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times. These actions could not have been a good faith exercise of prudent business judgment.

261. In addition, in breach of their fiduciary duties owed to Pilgrim's, the individual defendants have willfully or recklessly caused or permit the Company to continue its participation in a conspiracy aimed at manipulating the price of broiler chickens, as detailed herein. The individual defendants even caused the Company to actively execute this conspiracy

by coordinating with other broiler companies to limit the broiler production throughout the Relevant Period.

262.     During the course of the discharge of their duties, the individual defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the individual defendants caused the Company to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties owed to the Company and its shareholders.  As a result, the individual defendants grossly mismanaged the Company.

263.     As a direct and proximate result of the individual defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the individual defendants are liable to the Company.

264.     Plaintiff, on behalf of Pilgrim's, has no adequate remedy at law.

## COUNT III

## Against JBS for Breach of Fiduciary Duties

265.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

266.     As the majority shareholder and controller of the Company, defendant JBS owed and owes the Company fiduciary obligations.  By reason of its fiduciary relationships, JBS owed and owe the Company the highest obligation of good faith, loyalty, and due care.

267.     JBS has violated and breached its fiduciary duties of good faith, loyalty, and due care by causing or allowing the Company to disseminate false and misleading information to the public through press releases and various filing with the SEC.  These actions could not have been a good faith exercise of prudent business judgment.

268.   In addition, in breach of their fiduciary duties owed to Pilgrim's, JBS has willfully or recklessly caused or permit the Company to continue its participation in a conspiracy aimed at manipulating the price of broiler chickens, as detailed herein. JBS even caused the Company to actively execute this conspiracy by coordinating with other broiler companies to limit the broiler production over throughout the Relevant Period.

269.   As a direct and proximate result of JBS's failure to perform its fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, JBS is liable to the Company.

270.   Plaintiff, on behalf of Pilgrim's, has no adequate remedy at law.

## COUNT IV

### Against Defendants for Unjust Enrichment

271.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

272.   By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Pilgrim's.

273.   Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Pilgrim's.

274.   Plaintiff, as a shareholder and representative of Pilgrim's, seeks restitution from defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained defendants from their wrongful conduct and fiduciary breaches.

275.   Plaintiff, on behalf of Pilgrim's, has no adequate remedy of law.

## COUNT V

### Against All Defendants for Abuse of Control

276.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

277.    Defendants have taken advantage of their positions as the controllers, officers and/or directors of the Company to the detriment of Pilgrim's and the investing public by causing the Company to release false and misleading information regarding the Company's business and prospects.

278.    As such, defendants have abused their positions of control with the Company and are legally responsible.

279.    Thus, for the aforementioned reasons, defendants are liable to the Company for their wrongdoing.

## COUNT VI

### Against Defendants for Gross Mismanagement

280.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

281.    Defendants owed a duty of oversight to the Company in which they were responsible to ensure that the Company maintained adequate reporting controls for all financial, accounting, and disclosure released by the Company.  Furthermore, defendants were responsible to oversee, manage, and control the operations of the Company, including the manners and methods of reporting in which the acts complained herein occurred.

282.    Through the wrongful acts complained of herein, defendants refused or did not properly discharge their responsibilities to the Company and its shareholders in a prudent manner as prescribed by law as well as in the Company's corporate governance regulations.

283.    By committing the misconduct alleged herein, defendants breached their fiduciary

duties of due care, diligence, and candor in the management and administration of Pilgrim's affairs and in the use and preservation of the Company's assets.

284.    During the course of the discharge of their duties, defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet defendants caused the Company to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Pilgrim's, thus breaching their duties to the Company.

285.    As a result, defendants grossly mismanaged Pilgrim's and should be liable to the Company for the resulting damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Pilgrim's and that Plaintiff is an adequate representative of the Company;

B.    Determining and awarding to Pilgrim's the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

C.    Directing Pilgrim's and the director defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Pilgrim's and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

(1) a proposal to strengthen the Board's supervision of operations and develop

and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(2) a provision to permit the shareholders of Pilgrim's to nominate at least three candidates for election to the Board; and

(3) a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

D.     Determining and awarding to Pilgrim's exemplary damages in an amount necessary to punish defendants and to make an example of defendants to the community according to proof at trial;

E.     Awarding Pilgrim's restitution from defendants, and each of them;

F.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G.     Granting such other and further equitable relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: January 10, 2018                     Respectfully submitted,


*/s/ Jeffrey A. Berens*
Jeffrey A. Berens
BERENS LAW LLC
2373 Central Park Boulevard, Suite 100
Denver, Colorado 80238
Telephone: (303) 861-1764
Facsimile: (303) 395-0393
Email: jeff@jberenslaw.com

Edward W. Miller
LIFSHITZ & MILLER LLP

821 Franklin Avenue, Suite 209
Garden City, New York 11530
Telephone: (516) 493-9780
Facsimile: (516) 280-7376
Email: edmilleresq@aol.com

*Attorneys for Plaintiff*

## **VERIFICATION**

I, Malka Raul hereby declare as follows:

I am shareholder of PPC and have continuously so owned the Company's common stock during the relevant period. I declare that I am the plaintiff named in the foregoing Shareholder Derivative Complaint ("Complaint"), and know the content thereof; that the pleading is true to my knowledge, except as to those matters stated on information and belief, and that as to such matters I believe to be true.  I declare under penalty of perjury that the foregoing is true and correct.

Executed on 12/29/2017

Signature